UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

RYAN JAROMIN,                              )
                                          )
              *Plaintiff*,                 )
                                          )
       *vs.*                               )     No. 1:22-cv-00320-JMS-MJD
                                          )
TOWN OF YORKTOWN and MARSHAL TODD ST.      )
JOHN,                                      )
                                          )
              *Defendants*.                )

## ORDER

Plaintiff Ryan Jaromin is a police officer who has held various positions with the Yorktown Police Department ("YPD") since 2008. During his employment, he has had numerous clashes with former YPD Town Marshal Todd St. John. On February 14, 2022, Officer Jaromin initiated this litigation against Defendants the Town of Yorktown (the "Town") and Marshal St. John, and asserts claims for disability discrimination based on disparate treatment and a hostile work environment under the Equal Protection Clause of the Fourteenth Amendment, the Americans With Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("Rehabilitation Act"); retaliation in violation of the ADA, the Rehabilitation Act, and the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA"); interference with medical leave in violation of the FMLA; defamation; abuse of process; and intentional infliction of emotional distress. The Town and Marshal St. John have filed Motions for Summary Judgment which apply to all of Officer Jaromin's claims, [Filing No. 62; Filing No. 63], and Officer Jaromin has filed a Motion for Partial Summary Judgment which applies only to his retaliation claims under the ADA and the Rehabilitation Act, [Filing No. 98]. All of those motions are now ripe for the Court's consideration.

1

# I.
## STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).

Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

"The existence of cross-motions for summary judgment does not . . . imply that there are no genuine issues of material fact."  R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts, different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial."  Id. at 648.

## II.
### STATEMENT OF FACTS[1]

### A.    The Town and YPD

The Town's legislative body is the Town Council.  [Filing No. 64-1.]  The Town Council appoints the Town Manager, who serves at the Town Council's pleasure, functions as the Town's administrative head, and reports directly to the Town Council.  [Filing No. 64-2 at 1.]  The Town Manager does not make policy, but can make policy recommendations to the Town Council. [Filing No. 64-2 at 1.]

The Town Marshal is the head of YPD and is appointed by the Town Council after a comprehensive selection process.  [Filing No. 64-3 at 1; 64-5 at 14-15; Filing No. 64-6 at 23.]  As with the Town Manager, the Town Marshal serves at the pleasure of the Town Council and cannot make policy for the Town or for YPD, but may make policy recommendations to the Town Council.  [Filing No. 64-2 at 1.]

### B.    The Town's Discrimination and Retaliation Policies and Grievance Process

The Town has an Equal Employment Opportunity Policy (the "EEO Policy") that governs unlawful discrimination, retaliation, and claims under the ADA.  [Filing No. 64-2 at 2.]  The EEO Policy prohibits retaliation against employees who bring charges of unlawful discrimination. [Filing No. 64-2 at 2.]  It also provides that any employee with a disability, as defined by the ADA, who believes that he or she requires a workplace accommodation to perform the essential functions of their job should contact their supervisor as soon as possible.  [Filing No. 64-2 at 3.]

---

[1] The Court notes that many of the facts discussed are included as background information only, and their inclusion does not constitute a finding by the Court that the facts are material to the issues presented in the instant motions.

The Town also has a grievance policy applicable to all Town employees, including police personnel.  [Filing No. 64-2 at 9.]   The grievance procedure consists of three steps: (1) the employee speaks to a supervisor; (2) if the employee is not satisfied, he or she may request a meeting with the Town Manager; and (3) if the employee is still not satisfied, he or she may request a meeting in executive session with the Town Council.  [Filing No. 64-2 at 37.]

### C.   YPD Policies Regarding Reporting and Investigating Improper Workplace Behavior

YPD employees are not required to report unlawful discrimination or harassment through their normal chain of command and may instead go directly to the Town Manager.  [Filing No. 64-2 at 2.] YPD has a policy titled "Complaints and Investigations Against Department Members," which provides a mechanism whereby intra-departmental complaints can be presented to the Town Marshal.  [Filing No. 64-6 at 14-16; Filing No. 64-7 at 12-13.]  The Town Marshal does not have authority from the Town to investigate Equal Employment Opportunity Commission ("EEOC") charges, however.  [Filing No. 64-2 at 15; Filing No. 64-3 at 4.]

### D.   Officer Jaromin's Positions With YPD and Compensation

Officer Jaromin was hired as a patrolman by YPD in 2008.  [Filing No. 64-5 at 20-24.]  He was interviewed and hired by Marshal St. John, who was the Town Marshal at that time.  [Filing No. 64-5 at 24-25.]  During Officer Jaromin's probationary year, he worked on different shifts to familiarize himself with each shift.  [Filing No. 64-5 at 28.]  After his probationary year, he remained on one shift throughout the year.  [Filing No. 64-5 at 28.]

Officer Jaromin has held various positions with YPD, including his most recent position of investigator/detective, to which he was appointed in October 2022.  [Filing No. 64-5 at 24; Filing No. 64-9 at 1.]  In this position, he earns an additional $1,200 annual pay known as "tech pay."  [Filing No. 64-9 at 1; Filing No. 64-10 at 20-23.]  Tech pay is compensation that is paid in

addition to an officer's base salary, based on certain factors such as additional education, rank advancement, shift assignment, and serving in various capacities beyond basic patrol duties. [Filing No. 64-10 at 21; Filing No. 64-10 at 42-43.]  Officer Jaromin earned $2,900 in tech pay in 2020, $1,900 in tech pay in 2021, and $2,500 in tech pay in 2022.  [Filing No. 64-10 at 40-41.]

### E.    Officer Jaromin's Initial Interactions With Marshal St. John

Almost immediately upon his hiring, Officer Jaromin realized that Marshal St. John was someone with whom he was not going to see eye to eye.  [Filing No. 64-5 at 34-35.]  Officer Jaromin also lacked respect for the way in which Marshal St. John conducted himself as Police Chief, felt that Marshal St. John had a strong personality and was a polarizing figure, and compared his leadership style to that of former Indiana University men's basketball coach Bobby Knight. [Filing No. 64-5 at 35; Filing No. 64-5 at 41-42.]

Officer Jaromin observed that Marshal St. John was hostile towards others and used vulgar language, although use of that language was not uncommon at YPD.  [Filing No. 64-5 at 42-43.] Officer Jaromin first witnessed this behavior while at the Indiana Law Enforcement Academy, when he asked Marshal St. John if he could get a "class A uniform" for graduation and Marshal St. John responded that Officer Jaromin should just worry about "f***ing graduating" and that he did not need a "f***ing class A."  [Filing No. 64-5 at 35-36.]

Officer Jaromin also thought that Marshal St. John had positive traits – he was charismatic, energetic, and did "good things in law enforcement."  [Filing No. 64-5 at 41; Filing No. 64-5 at 61.]  Although he could be critical, Marshal St. John would still compliment Officer Jaromin on his work.  [Filing No. 64-5 at 59.]  During his first year at YPD, Officer Jaromin believed that his relationship with Marshal St. John was fine, not awful.  [Filing No. 64-5 at 170; Filing No. 64-5 at 176.]

**F.      The 2012 Police Action Shooting and Officer Jaromin's Administrative Leave**

In 2012, Officer Jaromin and another police officer, Jeffrey Wulff, were involved in a police action shooting in which the suspect and Officer Jaromin exchanged gunfire.  [Filing No. 64-2 at 3; Filing No. 64-5 at 72.]  During the incident, the suspect was shot, but Officer Jaromin was uninjured.  [Filing No. 64-5 at 72.]  Pursuant to YPD procedure, Officer Jaromin was placed on administrative leave and underwent a psychological evaluation as part of a fitness-for-duty assessment.  [Filing No. 64-2 at 3; Filing No. 64-5 at 72-73.]  Officer Jaromin was off of work for about one month.  [Filing No. 64-5 at 72.]

On November 30, 2012, psychologists from the Institute for Public Safety Personnel, Inc. evaluated Officer Jaromin.  [Filing No. 64-2 at 1-3.]  Based on the examination, Officer Jaromin was declared fit for duty because he was found to not be a danger to himself or others and "should be able to perform the essential duties of a police officer in a safe and effective manner."  [Filing No. 64-2 at 4.]  Looking back, however, Officer Jaromin believes he was "putting on a pretty good show" during his examination, and does not believe that he was physically or emotionally ready to return to work.  [Filing No. 64-5 at 81-82.]

While Officer Jaromin does not believe that his leave was handled inappropriately, and he was paid during his leave, Office Jaromin felt that Marshal St. John lacked empathy and concern after the shooting.  [Filing No. 64-5 at 73-75.]  Although Marshal St. John came to Officer Jaromin's house the day after the shooting when Officer Jaromin was not home, he did not call Officer Jaromin.  [Filing No. 64-5 at 75.]  Marshal St. John only brought up the shooting to tell Officer Jaromin that some Muncie police officers thought he was a "bad ass" and that women wanted to offer him sexual favors.  [Filing No. 64-5 at 74.]

During Officer Jaromin's leave, he ran into Marshal St. John at a local bar, and Marshal St. John asked Officer Jaromin how he was doing. [Filing No. 64-5 at 38-39.] Officer Jaromin said that he was okay, but that he was worried about Officer Wulff, who was also on leave due to his involvement in the shooting. [Filing No. 64-5 at 38; Filing No. 64-5 at 76.] Marshal St. John responded, "F*** Wulff; I hope he retires." [Filing No. 64-5 at 38.] Officer Wulff told Officer Jaromin that he also thought Marshal St. John showed a lack of concern for Officer Wulff after the shooting. [Filing No. 64-5 at 76.]

### G.   Officer Jaromin's Return to Work and His Post-Traumatic Stress Disorder

After Officer Jaromin returned to work, "behind the scenes" he experienced hypervigilance to the point of not being able to sleep and depression that was exhausting. [Filing No. 64-5 at 73; Filing No. 64-5 at 82.] His symptoms included mind racing, hypervigilance, anxiety, heart racing, and an inability to trust people. [Filing No. 64-5 at 83.]

The year after the 2012 shooting, Officer Jaromin's symptoms improved when he began taking medication to sleep. [Filing No. 64-5 at 84-85.] He sought treatment from his family physician and nurse practitioner, and also saw a family friend who is either a psychologist or a psychiatrist a few times during the year after the shooting. [Filing No. 64-5 at 85-87.] From 2013 to approximately 2020, Officer Jaromin was prescribed multiple anti-depressant and anti-anxiety medications, but his doctors believe he no longer needs those medications. [Filing No. 64-5 at 89-92.]

Officer Jaromin claims that his former primary care physician diagnosed him with post-traumatic stress disorder ("PTSD") in 2012 or 2013 and that the primary care physician he began seeing in 2015 told him that he had PTSD. [Filing No. 64-5 at 92-93; Filing No. 64-5 at 178.]

Officer Jaromin also had three sessions with a provider at Meridian Health Network in July 2020 through the Town's Employee Assistance Program ("EAP").  [Filing No. 64-5 at 93-94.]

Officer Jaromin shared his PTSD diagnosis with Officer Wulff, Officer Jeff Whitesell, Officer Mike Daugherty, Dee Freed (the Administrative Assistant for YPD), and Marshal St. John shortly after his diagnosis or sometime between 2013 and 2015.  [Filing No. 64-5 at 179.]  He discussed the diagnosis with Marshal St. John in passing, telling Marshal St. John that his hypervigilance caused his heart to race and that he was taking medication to help control his symptoms.  [Filing No. 64-5 at 181.]

### H.    Officer Jaromin's September 2015 Suspension

In 2015, Officer Jaromin conducted a traffic stop on Wesley Winkle, the son of Marshal St. John's friend, Joe Winkle, who was the Muncie Police Chief.   [Filing No. 64-5 at 37-38.] Officer Jaromin referred to Wesley Winkle as a "pussy" during the traffic stop, and Joe Winkle contacted Marshal St. John to let him know.  [Filing No. 64-5 at 37.]  Instead of listening to Officer Jaromin's side of the story, Marshal St. John took the Winkles' side, wrote Officer Jaromin up for falsifying a report and for conduct unbecoming of an officer, and suspended Officer Jaromin for three days.  [Filing No. 64-5 at 37; Filing No. 64-5 at 96-97.]  This is the only disciplinary action Officer Jaromin faced from Marshal St. John in the thirteen years that Officer Jaromin worked under Marshal St. John.  [Filing No. 64-5 at 57.]

Marshal St. John remembers Officer Jaromin telling him, in connection with the September 2015 suspension, that he sometimes loses his temper when he gets upset or stressed, but Marshal St. John does not recall any reference to PTSD.  [Filing No. 64-8 at 4.]  If Officer Jaromin mentioned his PTSD diagnosis in passing, Marshal St. John did not pick up on it.  [Filing No. 64-8 at 3.]  Officer Jaromin remembers that when he told Marshal St. John that he says things he

should not when agitated due to PTSD, Marshal St. John reduced his suspension from three days
to two. [Filing No. 64-5 at 96-97.] Officer Jaromin does not recall any discussions of his PTSD
with Marshal St. John after the September 2015 suspension, and does not recall ever telling
Marshal St. John that Marshal St. John's behavior triggered PTSD symptoms. [Filing No. 64-5 at
181; Filing No. 64-5 at 205-06; Filing No. 64-11 at 3.] Marshal St. John states that he did not
know that Officer Jaromin was diagnosed with PTSD until Officer Jaromin filed a worker's
compensation claim in June 2020. [Filing No. 64-8 at 3.]

### I.       The July 2016 Sergeant Position

On July 6, 2016, Officer Jaromin wrote a letter to Marshal St. John expressing his interest
in an open supervisor/sergeant position. [Filing No. 64-5 at 188.] A different individual was
ultimately hired, and Marshal St. John factored in Officer Jaromin's strengths and weaknesses in
making the decision. [Filing No. 64-5 at 203; Filing No. 64-8 at 4-5.] For strengths, Marshal St.
John considered that Officer Jaromin had "great detective experience," had obtained some good
results, and was displaying a better attitude. [Filing No. 64-5 at 190; Filing No. 64-8 at 4-5.]
Marshal St. John also considered that Officer Jaromin had applied to two positions with the
Department of Natural Resources and that Officer Jaromin had not attended supervisor school.
[Filing No. 64-8 at 4-5.]

### J.       Marshal St. John's Treatment of Other Officers

Marshal St. John did not treat other officers well, and six had left YPD since 2008. [Filing
No. 64-11 at 8.] This treatment included the following:

- Jeff Wulff: Marshal St. John had a general dislike of Officer Wulff and stated
  in 2012, "I don't give a f*** about Jeff Wulff. I hope he retires." [Filing No.
  64-11 at 6.] Marshal St. John would get angry and act discourteously toward
  Officer Wulff. [Filing No. 64-11 at 6.] Officer Wulff had seniority and was on
  day shift, but Marshal St. John changed his shift to afternoons so Officer Wulff

decided "it was just time to go." [Filing No. 64-11 at 6.]  Officer Wulff left YPD at the end of 2019 or early 2020.  [Filing No. 64-11 at 6.]

- Jaime Mixell:  In 2017, Officer Mixell left YPD because he and Marshal St. John were like "oil and water," and Marshal St. John picked on him for no reason.  [Filing No. 64-5 at 45-46.]  Officer Jaromin thought that Marshal St. John did things to make Officer Mixell's life miserable, including changing Officer Mixell's shift, cussing, and having a lack of empathy.  [Filing No. 64-11 at 5.]  Marshal St. John switched Officer Mixell's shift so that Officer Mixell could not work a side job, even though the changes were not preferred or seniority based. [Filing No. 64-11 at 5.]  Marshal St. John called Officer Mixell and others out in meetings and told them that they were doing things wrong. [Filing No. 64-11 at 5.]

- Jeff Whitesell:  Marshal St. John targeted Officer Whitesell by changing his shift, which led Officer Whitesell to have difficulty financing his college-aged child's education because the shift change prevented him from working a side job that was helping him to pay for his child's college.  [Filing No. 64-5 at 45; Filing No. 64-11 at 5.]  In 2019, Marshal St. John put Officer Whitesell on the midnight shift, even though Officer Whitesell was a sergeant whose rank entitled him to afternoon shifts, and Officer Whitesell then resigned.  [Filing No. 64-5 at 45; Filing No. 64-11 at 5.]  Officer Jaromin believes that Marshal St. John was always after Officer Whitesell and was "always belittling him, and making his life difficult," and that this is why Officer Whitesell left YPD. [Filing No. 64-5 at 56; Filing No. 64-11 at 6.]

- Michael Daugherty:  Officer Daugherty, who received the 2016 sergeant promotion that Officer Jaromin had applied for, thought that Marshal St. John was not as professional as he should have been when dealing with internal department matters.  [Filing No. 64-12 at 1.]  There were times when Officer Daugherty felt berated by Marshal St. John and Marshal St. John talked to him in ways he felt were unprofessional, which included using vulgar language and being yelled at during a departmental meeting. [Filing No. 64-12 at 1.]  Officer Daugherty felt that it was not uncommon for Marshal St. John to raise his voice during department-wide meetings when he was upset about perceived errors or poor judgment by officers. [Filing No. 64-12 at 2.]

Around this same time that Marshal St. John was mistreating other officers, Officer Jaromin felt that his relationship with Marshal St. John was unsalvageable. [Filing No. 64-5 at 129.]  Officer Jaromin did not respect the way that Marshal St. John conducted himself and the two did not have a working relationship and did not speak other than "orders and agreeance, so to speak." [Filing No. 64-5 at 41; Filing No. 64-5 at 129.]  Officer Jaromin was very emotional when

Officers Mixell and Whitesell left YPD.  [Filing No. 64-11 at 5.]  He had watched Marshal St. John's behavior toward the other officers and "knew that that was the MO.  I knew that there was another one on the chopping block.  I knew that the intimidation and hostile acts and behavior was going to be pointed towards somebody else, and I was fairly confident that was going to be me." [Filing No. 64-11 at 5.]  Officer Jaromin also felt this way due to Marshal St. John "changing my shifts, yelling at me for insignificant things, [and] losing his temper." [Filing No. 64-11 at 7.]

### K.     Officer Jaromin Applies for a Job With the Delaware County Sheriff's Office

In early 2020, Officer Jaromin applied for a position with the Delaware County Sheriff's Office ("DCSO").  [Filing No. 64-9 at 1.]  As part of the application process, he signed up to take a physical agility test and a written test.  [Filing No. 64-9 at 1.]  Several things factored into Officer Jaromin's decision to apply for the position with DCSO, including witnessing other YPD officers being "ran out" by Marshal St. John, which was hard on Officer Jaromin.  [Filing No. 64-5 at 109-10.]

The testing for the DCSO position was on February 2, 2020, yet earlier that week, Officer Jaromin had decided that he would not accept the position but that he would still undergo testing to see how he would do and because he thought other YPD officers would be there.  [Filing No. 64-5 at 117-19; Filing No. 64-5 at 125-26; Filing No. 64-5 at 198.]  Officer Jaromin had told Officer Daugherty the night before the testing that he was not going to take a job at DSCO, just in case Marshal St. John heard that Officer Jaromin had gone to the testing.  [Filing No. 64-4 at 125-29.]  After Officer Jaromin completed the testing, two other officers told him that Marshal St. John was mad at Officer Jaromin for not telling him that he was going to complete the testing.  [Filing No. 64-5 at 102-03.]  Marshal St. John thought that he and Officer Jaromin had a good working

relationship and was hurt when he found out from another source that Officer Jaromin had applied to work at DCSO.  [Filing No. 64-13 at 57-58.]

After learning that Marshal St. John was upset with him, Officer Jaromin drove to Marshal St. John's house and Marshal St. John told Officer Jaromin that they would meet with Pete Olson, the Town Manager, the next morning; that Officer Jaromin needed to leave because Marshal St. John was afraid of what he might say and do; and that if Officer Jaromin was offered a job at the DCSO, he should take it.  [Filing No. 64-5 at 101-08.]  The next morning, Officer Jaromin texted Marshal St. John to let him know he was there for the meeting, but Marshal St. John responded that he had calmed down and that they did not need to meet unless Officer Jaromin wanted to. [Filing No. 64-5 at 101.]  Officer Jaromin said that he wanted to meet and they met, along with Sergeant Chris Greene.  [Filing No. 64-5 at 101.]  Officer Jaromin explained that he did not want Marshal St. John to be mad at him and that he did not intend to take the job at DCSO but wanted to see who was at the testing and how he performed.  [Filing No. 64-5 at 114-17.]  Officer Jaromin told Marshal St. John that he was hurt that Marshal St. John had told him the day before that he needed to find another job, and Marshal St. John denied saying that.  [Filing No. 64-5 at 120.] Marshal St. John told Officer Jaromin that he once regretted not accepting a job and cautioned Officer Jaromin not to pass up a job opportunity that he wanted.  [Filing No. 64-5 at 121.]  Marshal St. John also stated that the fact that a person applies for a new job indicates that he is not happy with his current job.  [Filing No. 64-5 at 121.]  It did not make sense to Marshal St. John that someone would go through the rigors of the physical testing just to see if other officers were there. [Filing No. 64-8 at 6.]  Officer Jaromin insisted that he was happy at YPD and had no plan to leave, apologized for not telling Marshal St. John that he was going to the testing, and said that he

would let Marshal St. John know if he was seriously entertaining taking another job.  [Filing No. 64-4 at 123.]

### L.    Marshal St. John Criticizes Officer Jaromin for Contacting a Suspect

Also in early 2020, Marshal St. John criticized Officer Jaromin for calling a rape suspect, who Officer Jaromin knew personally, and discussing the investigation before the suspect had been detained.  [Filing No. 64-8 at 6-7.]  After the call, the suspect left town but returned a few weeks later, after Officer Jaromin called him and convinced him to return.  [Filing No. 64-8 at 6-7; Filing No. 64-11 at 13.]  Marshal St. John ordered Officer Jaromin to prepare a document explaining why he had not arrested the suspect the night that he initially called him, which Officer Jaromin felt that Marshal St. John did to "flex his muscles" in front of another officer.  [Filing No. 64-11 at 11.]  Marshal St. John told Officer Jaromin that he "f***ed up" the case in a meeting in front of multiple people.  [Filing No. 64-5 at 157-58.]

### M.    Officer Jaromin's June 15, 2020 Meeting With Mr. Olson

On June 15, 2020, Officer Jaromin met with the Town Manager, Mr. Olson, who he considers a friend.  [Filing No. 64-2 at 4; Filing No. 64-11 at 84.]  During the meeting, Officer Jaromin told Mr. Olson that he had been "hiding" some issues and that he was having mental health issues related to the 2012 police action shooting and issues from an unrelated arm injury.  [Filing No. 64-2 at 4.]  Officer Jaromin also told Mr. Olson that he had PTSD from the 2012 shooting and that the work environment in the police department was not helping his stress.  [Filing No. 64-2 at 4.]  Officer Jaromin said that he was experiencing stress, hypervigilance, and not sleeping well, but that he did not know why.  [Filing No. 64-2 at 4.]  Officer Jaromin further stated that he was at a "breaking point" and had concerns about how he might act or react while on duty and dealing with the public, but then minimized the gravity of his concern by saying that it was more about

14

him being "snippy." [Filing No. 64-2 at 4.]  Officer Jaromin explained that he had gotten angry at a fellow YPD employee for no reason.  [Filing No. 64-2 at 5.]

Officer Jaromin told Mr. Olson that his issues were "all a direct result of that work environment," and that while he did not want to "point[ ] any fingers," it was "getting bad." [Filing No. 65, Recording #39, at 6:10, 10:50.][2]  Officer Jaromin repeatedly referenced his PTSD diagnosis to Mr. Olson during the meeting.  [Filing No. 65, Recording #39, at 10:12, 11:56.] Officer Jaromin told Mr. Olson that he was getting medical help and had been taking anti-depressants but did not want police department administration to know about his physical and mental health issues out of fear that he would be taken off work.  [Filing No. 64-2 at 5.]  Officer Jaromin asked Mr. Olson not to tell Marshal St. John about his mental and physical issues, and Mr. Olson said that he would honor that to the extent that he could, but he was conflicted because he had concerns about whether Officer Jaromin could continue carrying out his duties without being a danger to himself and others.  [Filing No. 64-2 at 5.]  Officer Jaromin mentioned that he was looking for a specialist, and Mr. Olson told him that he would reach out to someone who might be able to provide a referral and ultimately provided the referral which resulted in Officer Jaromin receiving treatment at Meridian Health through the Town's EAP.  [Filing No. 64-2 at 5.]  Prior to this conversation, Mr. Olson did not know that Officer Jaromin had PTSD or any lingering mental health issues from the 2012 shooting.  [Filing No. 64-2 at 5.]

---

[2] Officer Jaromin recorded many of the conversations and meetings that form the basis of his allegations without the other participants' knowledge, and some of those recordings have been submitted in connection with the pending Motions for Summary Judgment.  Most of the information in the recordings upon which the parties rely appears elsewhere in the record but, when it does not, the Court cites to the relevant recordings.

### N.    Officer Jaromin Files a Worker's Compensation Claim

Marshal St. John held a meeting on June 29, 2020 that most YPD officers attended. [Filing No. 64-13 at 47-49.]  The purpose of the meeting was to discuss the manner in which another officer had handled an investigation, but Marshal St. John also spoke about Officer Jaromin calling the rape suspect. [Filing No. 64-13 at 50-54.]  Marshal St. John was close to banging his fist on the countertop at one point during the meeting, and kicked the door as he was leaving. [Filing No. 64-11 at 15-16.]

After the June 29, 2020 meeting, Officer Jaromin told Officer Daugherty that he had PTSD from the 2012 shooting and that, although he did not feel that Marshal St. John was impacting his ability to do his job, he wanted to file a worker's compensation claim. [Filing No. 64-11 at 16-17; Filing No. 64-12 at 2.] The worker's compensation claim form stated that Officer Jaromin's "nature of injury or illness" was "stress," referenced the 2012 police action shooting, and described the incident as follows: "Ryan stated that he can no longer deal with the stress of [the 2012 shooting] on his own without the help of a medical professional.  This makes it hard to deal with his day to day life and his profession." [Filing No. 64-11 at 29.]

Officer Daugherty called Marshal St. John to inform him of Officer Jaromin's worker's compensation claim, marking the first instance where Marshal St. John learned that Officer Jaromin believed he was suffering from PTSD from the 2012 police action shooting. [Filing No. 64-8 at 9.]  At that time, Marshal St. John believed that stressful police work in general was triggering Officer Jaromin's PTSD symptoms – neither Officer Jaromin nor Officer Daugherty told Marshal St. John that Marshal St. John's behavior toward Officer Jaromin and other officers was triggering the PTSD symptoms. [Filing No. 64-8 at 9.]  Upon learning that Officer Jaromin had reported that he suffered from PTSD, Marshal St. John told Officer Daugherty that Officer Jaromin

needed to be taken off patrol duty immediately.  [Filing No. 64-8 at 8.]  Three to four hours after completing the worker's compensation claim, Officer Daugherty told Officer Jaromin that he needed to clock out and go home because Officer Daugherty and Marshal St. John felt that he was a liability to the Town.  [Filing No. 64-11 at 17.]

### O.    Officer Jaromin Is Placed on Administrative Leave

The next day, on June 30, 2020, Officer Jaromin met with Marshal St. John and Sgt. Greene and was placed on administrative leave.  [Filing No. 64-8 at 8-9; Filing No. 64-11 at 17.]  Marshal St. John said that his primary concern was Officer Jaromin's well-being and that he receive the help he needed.  [Filing No. 64-8 at 8-9.]  Early in the meeting, Officer Jaromin stated that he just wanted to get help.  [Filing No. 65, Recording #28, at 2:52.]  Marshal St. John offered to look into resources for officers suffering from PTSD, attempted to explain why Officer Jaromin needed to be on administrative leave until cleared to return to duty, reassured Officer Jaromin that he would be able to return once cleared, and told Officer Jaromin that YPD was not the "only job in the world" to convey to him that if police work was too stressful, he could find another type of work. [Filing No. 64-8 at 8-9.]  Marshal St. John did not mean to suggest that Officer Jaromin should leave YPD.  [Filing No. 64-8 at 9.]  Marshal St. John explained that he would box up Officer Jaromin's belongings and put the box in Sgt. Greene's office, saying that it "ain't going nowhere," and not to "worry about what's going on here."  [Filing No. 64-11 at 21.]  Marshal St. John reiterated that Officer Jaromin would be on administrative leave with pay while the worker's compensation claim was being considered and offered to help Officer Jaromin find appropriate medical treatment.  [Filing No. 64-8 at 8-9.]  Marshal St. John also explained that Officer Jaromin would not have police powers while on leave because Marshal St. John had to think about the "worst case scenario" and had to look out not just for Officer Jaromin but for the other eight officers

and the 14,000 people who live in the Town.  [Filing No. 64-11 at 23.]  Officer Jaromin replied, "I get that" and "I got that" several times.  [Filing No. 64-11 at 23.]

During the meeting, Officer Jaromin asked for assurances that he could come back and that he was not "screwing himself."  [Filing No. 64-11 at 23.]  Marshal St. John said he could come back and stated to Officer Jaromin and Sgt. Greene "[he's] not done here."  [Filing No. 64-11 at 24.]  Sgt. Greene then said, "it's pulling the burden off you as a police officer then it's taking the liability off of us."  [Filing No. 64-11 at 24.]  Officer Jaromin replied, "I got you."  [Filing No. 64-11 at 24.]

Officer Jaromin then asked what the next steps were, and Marshal St. John said that he would get with Mr. Olson, they would make some calls to get Officer Jaromin help, and Officer Jaromin would need some type of evaluation before he could return.  [Filing No. 64-8 at 8-9; Filing No. 64-11 at 25.]  Officer Jaromin responded, "I need it," and Marshal St. John repeated that he does not know how all of this works because he has not had this situation before and he would call the Muncie Police Department to get some direction.  [Filing No. 64-11 at 25.]

At no time during the June 30, 2020 meeting did Officer Jaromin say that he did not want to be placed on administrative leave.  [Filing No. 64-11 at 80.]  Additionally, Marshal St. John was never told that he was part of the problem before Officer Jaromin was placed on administrative leave.  [Filing No. 64-13 at 251.]  The June 30, 2020 meeting was the only discussion Officer Jaromin had with Marshal St. John about the reason he was placed on administrative leave.  [Filing No. 64-11 at 35.]

### P.   Efforts to Assist Officer Jaromin With Mental Healthcare and Contact With Officer Jaromin During His Leave

Marshal St. John undertook to assist Officer Jaromin with finding appropriate healthcare for his PTSD, including the following efforts:

- July 1, 2020:  Marshal St. John texted Officer Jaromin to let him know that he had not heard back from the Fraternal Ordre of Police ("FOP") regarding healthcare resources.  [Filing No. 64-14.]  That same day, Marshal St. John emailed Joe Hamer with the FOP stating that he had an officer who had notified him on June 29 that he had been suffering from PTSD and needed someone to talk to and asking if Mr. Hamer could provide some direction.  [Filing No. 64-2 at 28.]

- July 7, 2020:  Angela Ellison, part of the FOP's Critical Incident Memorial Team, emailed Marshal St. John with some mental health resources and stated that she thought Marshal St. John was on the right track related to the worker's compensation claim and giving Officer Jaromin some time off.  [Filing No. 64-2 at 27-28.]

- July 13, 2020:  Mr. Olson and Marshal St. John emailed each other about getting a medical referral for Officer Jaromin.  [Filing No. 64-15.]  Marshal St. John attempted to communicate with Officer Jaromin about the status of Officer Jaromin getting mental health treatment, but Officer Jaromin did not respond.  [Filing No. 64-2 at 7; Filing No. 64-8 at 9-10.]  The Town's Office Manager, Erin Hurley, emailed Officer Jaromin to advise that she had contacted Meridian Health Services and that he should be getting a call soon.  [Filing No. 64-2 at 7.]  The Town paid for Officer Jaromin's treatment with Meridian Health Services through its EAP for services provided on July 28, 2020, August 6, 2020, and August 20, 2020.  [Filing No. 64-2 at 7.]

Aside from attempting to contact Officer Jaromin on July 13, 2020, Marshal St. John did not contact Officer Jaromin regarding his leave status until Officer Jaromin was cleared to return to duty.  [Filing No. 64-8 at 9-10.]  Officer Jaromin was concerned about Marshal St. John's involvement in his seeking health care, and rescheduled an appointment because of a personal relationship between the doctor and Marshal St. John.  [Filing No. 100-5 at 5.]  Officer Jaromin also worried that Marshal St. John had access to his personnel file.  [Filing No. 100-5 at 5-6.]  By late July 2020, Officer Jaromin was frustrated and felt that "[the] whole process [was] like running in quicksand."  [Filing No. 100-5 at 5.]

### Q.   Marshal St. John Begins Looking for Officer Jaromin's Replacement

The day after placing Officer Jaromin on administrative leave, Marshal St. John emailed an individual who had applied for an officer position and stated "[i]t is possible we might have a

spot opening in August or September.  You still interested?"  [Filing No. 100-2 at 2.]  Marshal St. John told Ms. Freed to contact the next applicant on the hiring list and also told Erin Gross to reach out to an officer at the Muncie Police Department.  [Filing No. 64-13 at 151; Filing No. 64-13 at 157.]

### R.    Officer Jaromin's Compensation While on Administrative Leave and Denial of His Worker's Compensation Claim

On August 12, 2020, Officer Jaromin's worker's compensation claim was denied.  [Filing No. 100-21 at 5; Filing No. 100-21 at 9.]  Marshal St. John met with Mr. Olson and told him that Officer Jaromin "needed to go on FMLA" and that he wanted Officer Jaromin "to have to start burning his PTO."  [Filing No. 100-21 at 5-9.]  Also on August 12, the Town sent Officer Jaromin a letter advising that his paid administrative leave would continue until August 17, 2020, at which time if he wanted to continue on administrative leave, it would be unpaid.  [Filing No. 64-2 at 31.]  The letter also explained that Officer Jaromin could submit a written request to return to work with fitness-for-duty clearance.  [Filing No. 64-2 at 31.]

### S.    Officer Jaromin Retains an Attorney and His Paid Administrative Leave Is Extended

Upon receipt of the Town's letter, Officer Jaromin retained Attorney John Brooke who sent an August 24, 2020 letter to Mr. Olson stating that "[Officer] Jaromin wishes to return to work in the same position and capacity that he was in at the time of being placed on administrative leave," and that the Town was obligated to maintain Officer Jaromin's pay while on involuntary leave and to pay for the required fit-for-duty exam.  [Filing No. 64-2 at 32.]  The Town agreed to extend Officer Jaromin's paid leave through September 6, 2020.  [Filing No. 64-2 at 33-34.]

### T.      Evaluations Regarding Officer Jaromin's Fitness for Duty

On August 27, 2020, Officer Jaromin's primary care physician noted that she had "no current concerns or reservations regarding his physical or mental health and capacity that would prevent him from fulfilling his duties as a police officer safely and effectively," and found him "fit for duty." [Filing No. 64-17.]  On September 2, 2020, Officer Jaromin received a fitness-for-duty evaluation with Public Safety Medical ("PSM").  [Filing No. 64-2 at 9.]  The evaluator concluded that Officer Jaromin "is considered fit for duty and should be able to perform the essential duties of a police officer."  [Filing No. 69 at 7.]

### U.      Officer Jaromin Takes FMLA Leave

On September 10, 2020, Marshal St. John sent Officer Jaromin an email welcoming him back and advising him that he had spoken to Officer Jaromin's supervisor, Sgt. Greene, and advised him to put Officer Jaromin on the afternoon schedule immediately.  [Filing No. 64-11 at 193.] That same day, upon hearing that he could immediately return to work, Officer Jaromin went to speak to Mr. Olson.  [Filing No. 64-11 at 32.]  Officer Jaromin recorded the conversation without Mr. Olson's knowledge.  [Filing No. 64-11 at 32.]  During the meeting, Officer Jaromin told Mr. Olson that he had received a phone call from Sgt. Greene advising Officer Jaromin that he could return to work that evening after being on administrative leave since June 30, 2020.  [Filing No. 64-2 at 10.]  He expressed concern that he had not heard from anyone from the Town during his leave and noted that he was upset because he heard that his job was offered to someone else. [Filing No. 64-2 at 10.]

During their meeting, Mr. Olson assured Officer Jaromin that his position was secure and had not been offered to anyone else, told Officer Jaromin that he had not lost any seniority or pay, and advised him that because his fitness-for-duty evaluation cleared him, he could return to work.

[Filing No. 64-2 at 10.]  Mr. Olson and Officer Jaromin further discussed how Officer Jaromin had brought his mental health issues to YPD administration's attention and Officer Jaromin tried to rehash the decision to place him on administrative leave and thought that the decision to place him on leave was also a decision that he was unfit for duty.  [Filing No. 64-2 at 11.]  Officer Jaromin also said that he felt out of the loop with other YPD officers during his leave and felt alienated from YPD.  [Filing No. 64-2 at 11.]

Officer Jaromin then mentioned a vacation he had planned for the following week, that was scheduled before he was placed on administrative leave.  [Filing No. 65, Recording #37, at 7:20.] Mr. Olson asked if the vacation had been cleared by Sgt. Greene and Marshal St. John, and Officer Jaromin questioned having to clear it with them.  [Filing No. 65, Recording #37, at 7:24-7:30.] Mr. Olson told Officer Jaromin that Officer Jaromin would have to clear it with Sgt. Greene and Marshal St. John and said, "yea, when you put the request in, I assume it is still good."  [Filing No. 65, Recording #37, at 7:50.]

Officer Jaromin told Mr. Olson during the meeting that his anxiety level was higher than it was before his administrative leave, even though Officer Jaromin had been on leave since June 29 and had been declared fit for duty by his own doctor and by PSM.  [Filing No. 64-2 at 12.]  Officer Jaromin then asked about his options for taking more time off of work, including FMLA leave. [Filing No. 64-2 at 12.]  When Mr. Olson asked Officer Jaromin what he wanted, Officer Jaromin replied, "I want an environment at work where I feel like that…I can succeed.  That there's not somebody out to get me all the time….  We need to figure out what the problems are, what the deal is."  [Filing No. 65, Recording #37, at 21:06.]  Officer Jaromin characterized the decision to place him on administrative leave in response to his request for help as "sickening," "disgusting, bullying, intimidating, hostile, [and] childish…."  [Filing No. 65, Recording #37, at 23-25.]  He

stated that his situation may cause his colleagues to worry "[i]f I go and ask for help, am I going to be run out of the department or am I gonna be put on administrative leave and all my stuff is gonna be taken away[?]" [Filing No. 65, Recording #37, at 23:57.] Mr. Olson expressed sympathy and concern to Officer Jaromin, but defended the decision to place Officer Jaromin on leave and suggested that Officer Jaromin may need to resign if he could not be happy working at YPD. [Filing No. 65, Recording #37, at 28:58.]

After speaking with Mr. Olson, Officer Jaromin spoke to Sgt. Greene and told him about his scheduled vacation the following week. [Filing No. 65, Recording #49, at 1:57.] Officer Jaromin told Sgt. Greene that he was going on the vacation, and that there was no way he was going to work that day, the following day, or the following week. [Filing No. 65, Recording #49, at 1:57, 2:10.] Officer Jaromin told Sgt. Greene that he did not care if he was off the schedule for two weeks, the two discussed Officer Jaromin getting on the schedule and using personal time off, and Sgt. Greene said that he would check to see if Officer Jaromin could be put back on the schedule. [Filing No. 65, Recording #49, at 2:14-4:54.] Sgt. Greene asked Officer Jaromin how much time he would need to get ready to return after his vacation and Officer Jaromin said, "a day or two." [Filing No. 65, Recording #49, at 5:02-5:10.] Sgt. Greene proposed September 22 and Officer Jaromin responded "maybe." [Filing No. 65, Recording #49, at 5:56.] Throughout their conversation, Officer Jaromin expressed surprise that he was expected to immediately return to work and stated that he was unprepared to do so. [*See, e.g.*, Filing No. 65, Recording #49, at 5:15.] Sgt. Greene acknowledged that expecting Officer Jaromin to start work that evening was "pretty f***ing short notice." [Filing No. 65, Recording #49, at 1:28, 3:02.] Officer Jaromin never advised Marshal St. John of his planned vacation and, had he done so, Marshal St. John would

have told him to speak to Sgt. Greene about his schedule after his return from vacation and would not have prevented him from taking vacation. [Filing No. 64-8 at 12.]

On September 21, 2020, Officer Jaromin completed FMLA paperwork. [Filing No. 64-2 at 12.] Officer Jaromin's doctor stated that Officer Jaromin was incapacitated from September 21, 2020 to December 14, 2020, but did not indicate why leave was needed or why Officer Jaromin was incapacitated. [Filing No. 64-2 at 12; Filing No. 64-2 at 38-40.] The Town granted Officer Jaromin's FMLA leave request and his leave ended on December 14, 2020. [Filing No. 64-2 at 12.] Officer Jaromin had no contact with Marshal St. John while he was on FMLA leave. [Filing No. 64-8 at 9-12.]

During his FMLA leave, Officer Jaromin worked at the post office beginning in October 2020. [Filing No. 64-11 at 50.] In November 2020, he worked as a police officer for IU Health, a position in which he carried a badge, carried a gun, and had arrest powers. [Filing No. 64-11 at 92.] Officer Jaromin also applied for employment at the Veteran's Hospital in Indianapolis while on FMLA leave. [Filing No. 64-11 at 50.]

Officer Jaromin returned to work at YPD in December 2020. [Filing No. 64-11 at 45-46.] Upon his return, he met with Marshal St. John and had a prepared statement thanking Marshal St. John for reaching out during his leave, noting that it meant a lot to him, stating that he was ready to come back to work, and stating that he was going to put his best foot forward and lead by example. [Filing No. 64-11 at 59.] Officer Jaromin's gear was returned to him and he was given time to get his police car ready. [Filing No. 64-11 at 59.]

### V.     Marshal St. John's Remarks, Retaliatory Acts, and Misconduct

Officer Jaromin never heard Marshal St. John make derogatory comments about his PTSD and Marshal St. John denies making such comments, [Filing No. 64-11 at 43; Filing No. 64-13 at

83; Filing No. 64-13 at 154], but Officer Jaromin said he heard from others that Marshal St. John made the following remarks:

- That PTSD was a farce and that Officer Jaromin was a "coward" or "pussy";

- That Officer Jaromin was incapable of being an investigator;

- That "[n]ow he's got PTSD," referring to Officer Jaromin and laughing about it;

- That Officer Jaromin needed to "nut up" and that the PTSD was "all in his head."

[Filing No. 64-11 at 12; Filing No. 64-11 at 47; Filing No. 64-11 at 51.] Others also reported that Marshal St. John was in a bad mood or yelling if he heard Officer Jaromin's name. [Filing No. 64-11 at 51.]

After his return from leave, Officer Jaromin and Marshal St. John had little direct interaction, [Filing No. 64-8 at 14], but Officer Jaromin contends that Marshal St. John retaliated against him or mistreated him in connection with the following incidents:

- **Status as Investigator:** Officer Daugherty recommended that Officer Jaromin not have too many responsibilities upon his return to keep his stress level lower, and suggested that he work as a patrol officer rather than in investigation – his position before administrative leave. [Filing No. 64-12 at 2.] Marshal St. John followed the recommendation, knowing from his own experience that a detective position is the most stressful position in the department. [Filing No. 64-8 at 13.] Officer Jaromin could still investigate his own cases but would not be obligated to be on a 24-hour call to respond to any type of crime. [Filing No. 64-8 at 13.] As a result of not returning as an investigator, Officer Jaromin lost the tech pay he would have earned as an investigator. [Filing No. 64-13 at 100-01.] Marshal St. John told Officer Jaromin that he could be reinstated as an investigator and Officer Jaromin returned to an investigator position in July or August 2021. [Filing No. 64-11 at 81.]

- **Schedule:** Officer Jaromin contends that his schedule was changed multiple times upon his return from leave. [Filing No. 64-11 at 59.] YPD had 3 shifts: day (supervised by Marshal St. John), afternoon (supervised by Sgt. Greene), and midnight (supervised by Officer Daugherty). [Filing No. 64-8 at 13.] Marshal St. John assigned officers to each shift, and then the shift supervisor determined the days off for the officers on his shift. [Filing No. 64-8 at 13.]

Officer Jaromin's shift changed at least eight times from December 2020 to July 2021.  [Filing No. 64-8 at 15-16; Filing No. 64-11 at 48; Filing No. 64-11 at 61-64; Filing No. 64-11 at 194-224.]

- **2021 Sergeant Promotion:**  Officer Jaromin contends that he submitted a January 12, 2021 letter to Marshal St. John expressing interest in an Investigations Sergeant position, but Marshal St. John does not remember soliciting or receiving the letter.  [Filing No. 64-8 at 14; Filing No. 64-11 at 91; Filing No. 64-26.]  No one was promoted to that position.  [Filing No. 64-11 at 91.]

- **Other Incidents:**  Officer Jaromin alleges that the following incidents amount to misconduct or were aimed at him:

  o  Marshal St. John spoke at a 2021 Town Council meeting and said that he did not want police officers appointed to town boards and, specifically, that he did not want Officer Jaromin on the planning commission.  [Filing No. 64-8 at 15; Filing No. 64-11 at 67.]  Officer Jaromin had already been on the planning commission for several years and was appointed in 2021 notwithstanding Marshal St. John's objection.  [Filing No. 64-8 at 15; Filing No. 64-11 at 78.]

  o  Officer Jaromin's wife commented on a Facebook post announcing the hiring of a new officer, Rachel Ginn, and asked whether the position was advertised.  [Filing No. 85-2 at 1.]  Marshal St. John sent a text to YPD officers stating "Welcome to the [YPD] [three laughing emojis].  Don't worry Rachel you'll get used to it.  I did."  [Filing No. 85-3 at 1.]

  o  While out to dinner with his girlfriend, Marshal St. John received a call that the Dollar General store in Yorktown had been robbed.  [Filing No. 64-13 at 167.]  Marshal St. John and his girlfriend went to the scene and went into the store.  [Filing No. 64-13 at 168.]  Officer Jaromin, who was on the scene, did not object or say anything to them.  [Filing No. 64-13 at 168.]

  o  Officers Jaromin and Daugherty were working on a case in which a suspect had stolen items from a storage locker, including a boat.  [Filing No. 64-13 at 169.]  Marshal St. John had contacted the boat owner and arranged for him to come from Florida to retrieve the boat.  [Filing No. 64-13 at 170.]  In the meantime, Officers Jaromin and Daugherty had not communicated that the boat was stolen, Officer Daugherty told the suspect (who had bonded out of jail) to take the boat, and the suspect took the boat.  [Filing No. 64-13 at 169-70.]  Officer Daugherty later told Marshal St. John that he had mistakenly released the boat to the suspect, and Marshal St. John contacted the suspect and got him to return the boat, and completed paperwork documenting what had occurred.  [Filing No. 64-13 at 170.]

26

Officer Jaromin contends that Marshal St. John made the following comments to him over the entire course of his employment:

- "I have 20 people lined up to replace you":  Officer Jaromin contends that Marshal St. John made this statement to him multiple times, both one-on-one and with others present.  [Filing No. 64-11 at 11-12.]  Marshal St. John also said this to others, including Officers Whitesell and Mixell.  [Filing No. 64-5 at 152-53.]  Officer Jaromin believes this statement was made in retaliation for him applying for the DCSO position.  [Filing No. 64-5 at 153.]

- "I reward my friends and punish my enemies":  Marshal St. John said this to Officer Jaromin and posted it outside his office door, and Officer Jaromin interpreted it as a negative comment about him.  [Filing No. 64-5 at 153-54; Filing No. 64-11 at 12.]  Others reached the same conclusion, but it could have been directed at Officers Whitesell or Mixell.  [Filing No. 64-5 at 154-55.]

- "Maybe you are the one that needs to go":  Marshal St. John texted this to Officer Jaromin in 2019, in response to Officer Jaromin's comment that another officer should work for the sheriff's office.  [Filing No. 64-5 at 156.]

- "You f***ed up that case":  Marshal St. John said this at a 2020 meeting regarding Officer Jaromin's contacts with the rape suspect.  [Filing No. 64-5 at 157-58.]

- "I'm done talking to you.  I'm afraid of what I might say":  Marshal St. John said this on the day of the DCSO testing, when Officer Jaromin went to Marshal St. John's house.  [Filing No. 64-11 at 12.]

- "Your replacement is a phone call away":  Marshal St. John said this many times to Officer Jaromin and other officers.  [Filing No. 64-5 at 162; Filing No. 64-11 at 12.]

- "Go find another job":  This may have been said during the encounter after Officer Jaromin went to the DCSO testing.  [Filing No. 64-11 at 12.]

- "Before you do me wrong, make sure you never need me again" and "I burn bridges because I can swim; don't ever think I need you":  These sayings were posted outside of Marshal St. John's office, Officer Jaromin saw them when he returned from leave, and others told him the quotes were about him but did not say how they knew that.  [Filing No. 64-11 at 12.]

27

**W.     Officer Jaromin's Reports of Marshal St. John's Behavior and the Town's Investigation**

Before 2018, Officer Jaromin spoke to his supervisors, including Officers Wulff, Whitesell, and Daugherty, about Marshal St. John's behavior.  [Filing No. 64-5 at 65-66.]  Although matters were not resolved to Officer Jaromin's satisfaction, he decided it would not be in his best interest to pursue things further.  [Filing No. 64-5 at 66.]  Officer Jaromin also spoke to Mr. Olson before 2018 about Officer Jaromin's behavior and raised issues including nepotism, ghost employment, favorable treatment of some officers, and bullying and harassment of other officers.  [Filing No. 64-5 at 67.]

On one or more occasions prior to June 2020, Officer Jaromin told Mr. Olson that he felt that morale was low at YPD and that he disagreed with the way YPD was being run, but he was not specific about whether the issues he perceived were ongoing and when Mr. Olson pressed him for details, he was vague.  [Filing No. 64-2 at 6.]  Mr. Olson asked Officer Jaromin to put his concerns in writing, but Officer Jaromin did not do so until April 7, 2021.  [Filing No. 64-2 at 6; Filing No. 64-2 at 16.]  Officer Jaromin also did not communicate any concerns to Town Council President Lon Fox prior to April 7, 2021.  [Filing No. 64-3 at 4.]

On April 7, 2021, the Town received a letter from Officer Jaromin's attorney raising numerous issued under the ADA, the FMLA, and the Equal Protection Clause of the Fourteenth Amendment.  [Filing No. 64-2 at 3; Filing No. 64-2 at 13.]  On April 8, 2021, the Town Manager sent written notice to Marshal St. John that the Town had received notification of possible litigation against the Town by Officer Jaromin, that management of YPD "must continue as a matter of procedure," that "Officer Jaromin should not be singled out for retribution due to litigation against the Town," and that "[h]e and the rest of the officers and staff should be treated professionally while being held to the standards of the office."  [Filing No. 64-2 at 13-14.]

28

On April 15, 2021, the Town retained a law firm to conduct an independent investigation into Officer Jaromin's allegations.  [Filing No. 64-2 at 14.]  The investigation entailed a holistic review of departmental management and police officer morale and resulted in findings that Marshal St. John fostered a work environment that was not conducive to building and maintaining employee morale.  [Filing No. 64-2 at 14.]  The Town warned Marshal St. John that the investigation may result in his termination.  [Filing No. 100-1 at 84.]  The investigation found that Officer Jaromin's concerns were consistent with what other police officers described and how they were treated, and found that a change in YPD leadership would be beneficial for boosting employees' morale.  [Filing No. 64-2 at 15.]  Specifically, the investigation results noted a "substantiation of concerns that St. John fostered a work environment within the police department that was not conducive to building and maintaining employee morale," but found that Officer Jaromin had not been targeted and instead was "treated like other members on the department." [Filing No. 64-2 at 14-15.]

### X.    Officer Jaromin's First EEOC Charge and Marshal St. John's Perjury Investigation

On April 23, 2021, Officer Jaromin filed a Charge of Discrimination with the EEOC. [Filing No. 100-8.]  In the Charge, Officer Jaromin alleged that he had been discriminated against, harassed, and retaliated against based on his PTSD, in violation of the ADA and the Rehabilitation Act.  [Filing No. 100-8 at 2.]

As Town Marshal, Marshal St. John had the authority to investigate officer misconduct. [Filing No. 64-8 at 1; Filing No. 64-8 at 17.]  Marshal St. John interviewed witnesses, obtained statements, gathered documents, and provided his account of events related to Officer Jaromin's allegations.  [Filing No. 64-8 at 17-18; Filing No. 77-4 at 1-8.]  Marshal St. John informed multiple YPD officers that YPD was "conducting an internal investigation" into Officer Jaromin's

allegations, "which may lead to a complaint and/or disciplinary action." [*See, e.g.*, Filing No. 100-1 at 52.] Marshal St. John also conducted video-recorded interviews of Officers Barnard, Greene, Gross, and Daugherty in YPD's interrogation room and admonished each of YPD's procedures regarding complaints and investigations against department members – including the prohibition against giving false testimony, their obligation to cooperate, and that a "[r]efusal to answer questions posed during the course of such an examination shall be a basis for disciplinary action." [*See, e.g.*, Filing No. 104 (Brooke Barnard Interview).] At the end of each interview, Marshal St. John asked each interviewee to agree that if any of the allegations in Officer Jaromin's EEOC Charge were false, then Officer Jaromin had committed perjury. [*See, e.g.*, Filing No. 104 (Brooke Barnard Interview).]

Marshal St. John reported his findings to the Town Council that he believed Officer Jaromin's EEOC Charge contained false allegations made under oath and that Marshal St. John had been conducting his own investigation into the allegations. [Filing No. 64-2 at 15; Filing No. 64-8 at 17.] Marshal St. John emailed a 92-page report, including attachments, to the Town. [Filing No. 64-2 at 15; Filing No. 64-3 at 3; Filing No. 100-1.] Marshal St. John asked the Town's attorney to review his report before he proceeded with disciplinary action and told the Town Board that "[t]he results of this Investigation will be forwarded to the Delaware County Prosecutor's Office for review." [Filing No. 64-13 at 176; Filing No. 100-1 at 8.] In the report, Marshal St. John noted that the disciplinary action against Officer Jaromin could include termination and that perjury "is a Level 6 felony punishable by imprisonment for six months to two and a half years and a fine of up to $10,000." [Filing No. 119 at 2-4.]

Up until receiving Marshal St. John's report, the Town was not aware that Marshal St. John had been conducting his own investigation. [Filing No. 64-2 at 15.] On May 19, 2021, the Town

directed Marshal St. John to take no further action in response to the EEOC Charge and that any response would be handled by the Town's attorney.  [Filing No. 64-2 at 16.]

### Y.    Marshal St. John Retires and Officer Jaromin Applies for His Position

Based on the findings from the Town's investigation, the Town Council concluded that a change in departmental leadership was needed.  [Filing No. 64-2 at 15.]  Marshal St. John retired from YPD and his position of Town Marshal effective July 19, 2021.  [Filing No. 64-2 at 16.]  The Town accepted applications for the Town Marshal position, but Officer Jaromin did not apply. [Filing No. 64-3 at 5.]  The Town hired Shane Ginnan, but he resigned effective June 10, 2022. [Filing No. 64-3 at 5-6.]

Approximately 13 candidates applied for the vacant Town Marshal position created by Marshal Ginnan's resignation, including Officer Jaromin.  [Filing No. 64-3 at 6.]  Officer Jaromin and Officer Walthour were the two finalists and they were interviewed in the final round by the entire Town Council.  [Filing No. 64-3 at 7.]  During the interview process, Officer Jaromin was told that he was not a bona fide candidate in the eyes of the Town Board.  [Filing No. 64-11 at 69.] He had multiple conversations with Board Member Bob Ratchford, who told him that the Board would not consider him for the Town Marshal position because he had sued the Town.  [Filing No. 64-11 at 68.]  Board Member Marta Guinn, who is Marshal St. John's cousin, called Officer Jaromin and told him that she had emailed the Town Board and asked them to consider this lawsuit in the decision-making process and expressing doubt that Officer Jaromin could legally serve as Town Marshal.  [Filing No. 64-13 at 135; Filing No. 100-20 at 4.]  Former Marshal Ginnan recommended that the Board hire Officer Jaromin but was told by Board members, "[t]hat's never going to happen.  We are not entertaining [Officer Jaromin] for the position because he sued the [T]own."  [Filing No. 64-11 at 68-69.]

Officer Walthour was ultimately hired as the Town Marshal.  [Filing No. 64-3 at 7.]  He presented as the most polished and professional candidate and Town Council members unanimously believed that he was the most qualified based on his experience serving as the jail commander of the Delaware County Jail from 2019 to 2022, where he managed approximately 72 employees and over 400 inmates.  [Filing No. 64-3 at 7.]  Officer Walthour presented very well during the interview, was articulate and insightful, and provided an excellent vision of how he would manage the duties of Town Marshal and lead YPD.  [Filing No. 64-3 at 7.]  He also had experience with making and meeting a budget and in state and federal grant writing.  [Filing No. 64-3 at 7.]  Officer Jaromin thinks that Officer Walthour was a good hire.  [Filing No. 64-5 at 50-51.]

### Z.      Officer Jaromin's Second EEOC Charge and This Lawsuit

On December 6, 2022, Officer Jaromin filed a second EEOC Charge based on the Town's failure to hire him as the Town Marshal.  [Filing No. 100-9.]  The EEOC issued a right to sue letter on June 12, 2023.  [Filing No. 100-10.]

Officer Jaromin initiated this litigation on February 14, 2022, [Filing No. 1], and filed the operative Amended Complaint on March 8, 2022, [Filing No. 9].  He sets forth claims for disability discrimination and hostile work environment in violation of the ADA, the Rehabilitation Act, and the Equal Protection Clause of the Fourteenth Amendment; retaliation in violation of the ADA, the Rehabilitation Act, and the FMLA; interference with medical leave in violation of the FMLA; defamation; abuse of process; and intentional infliction of emotional distress.  [Filing No. 9 at 14-24.]

### III.
#### DISCUSSION

The Court emphasizes at the outset that the parties' briefs are difficult to follow, often conflating various claims and concepts (e.g., discussing discrimination and retaliation interchangeably), addressing issues in different orders rather than clearly delineating their responses to each other's arguments, and ignoring opposing arguments or evidence altogether. Additionally, Officer Jaromin's pleadings are redundant, alleging multiple claims under different statutes, the Constitution, and the common law that each seek the same relief for the same actions. While this practice is not prohibited, it has certainly required the parties and the Court to spend an inordinate amount of time analyzing the same conduct through multiple lenses. Indeed, the parties have filed 290 pages in briefs and over 1,400 pages of exhibits (plus numerous audio and video recordings) in connection with the pending Motions for Summary Judgment. All of these factors have made the Court's review of the pending motions unnecessarily cumbersome and tedious, but the Court has done its best to identify and address all of the parties' arguments.

**A.     Discrimination Claims**

Officer Jaromin asserts disability discrimination claims based on both disparate treatment and a hostile work environment under the ADA, the Rehabilitation Act, and the Equal Protection Clause of the Fourteenth Amendment. [Filing No. 9 at 14-16.] The Court addresses his claims in turn.

*1.     Disparate Treatment Claims*

a.     <u>The ADA and the Rehabilitation Act</u>

**i.     Claims Against Marshal St. John**

In his Motion for Summary Judgment, Marshal St. John states that "[i]t appears that the [ADA and Rehabilitation Act claims] are only pleaded against [the Town]. [Marshal] St. John

33

cannot be individually liable under either Act because he was neither an 'employer' under the ADA or a recipient of federal funding under the Rehabilitation Act." [Filing No. 89 at 3.]

Officer Jaromin does not address Marshal St. John's argument in his response brief, but refers generally to "Defendants" in connection with his ADA and Rehabilitation Act discrimination claims. [*See* Filing No. 109 at 63 (Officer Jaromin arguing that "Defendants discriminated against [him] on the basis of his disability.").]

Marshal St. John does not address Officer Jaromin's ADA and Rehabilitation Act claims in his reply. [*See* Filing No. 122.]

The ADA and the Rehabilitation Act provide only for "employer" liability – there is no liability against individual employees or supervisors. *Stanek v. St. Charles Comm. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015); *E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1282 (7th Cir. 1995). Accordingly, to the extent that Officer Jaromin brings his ADA and Rehabilitation Act discrimination claims based on disparate treatment against Marshal St. John, Marshal St. John's Motion for Summary Judgment is **GRANTED** as to those claims.

### ii.   Claims Against the Town

In support of its Motion for Summary Judgment, the Town argues that Officer Jaromin has not presented any evidence that he has been diagnosed with PTSD as a result of the 2012 shooting, so his discrimination claims under the ADA and the Rehabilitation Act fail. [Filing No. 81 at 10.] It asserts that Officer Jaromin told Mr. Olson that he was hiding his health condition during their June 15, 2020 meeting, so the Town could not have known that he was suffering from PTSD before then in any event. [Filing No. 81 at 10.] The Town contends that even if Officer Jaromin had a disability, it is unclear to what extent his life activities were impacted and he claimed that he was fit for duty even when he was placed on administrative leave and then took FMLA leave. [Filing

No. 81 at 10.]   The Town also argues that Officer Jaromin was not subject to an adverse employment action, noting that he was not terminated or demoted, he was paid during his administrative leave, and he only lost $1,000 in "nominal" compensation when he returned from leave.  [Filing No. 81 at 12-13.]  The Town contends that Officer Jaromin cannot make a prima facie showing of discrimination because he has not pointed to similarly situated individuals outside of his protected class who were treated more favorably than he was, stating that "[t]he undisputed record is replete with evidence that [Officer] Jaromin believed he was the target of [Marshal] St. John's wrath like several officers allegedly run off the department." [Filing No. 81 at 13.]  It argues that there is no evidence that he faced an adverse employment action due to his disability and that "[t]o the contrary, once the [T]own was alerted to [his] health problems it began assisting him in securing medical care and [he] took advantage of the [T]own's EAP." [Filing No. 81 at 13-14.]

Officer Jaromin argues in his response that he is disabled and has a diagnosis of an adjustment disorder and PTSD.  [Filing No. 109 at 63.]  He asserts that he disclosed his PTSD diagnosis to Mr. Olson in June 2020, and then was placed on administrative leave and "stripped of his  investigator duties" because of his PTSD, which were all adverse actions.  [Filing No. 109 at 63.]

In its reply, the Town argues that Officer Jaromin has not designated admissible medical evidence showing that he was diagnosed with PTSD following the 2012 shooting or that he had a medical condition that substantially limits one or more major life activities.  [Filing No. 121 at 3.] It asserts that Officer Jaromin's own testimony that he was diagnosed with PTSD, without providing medical records reflecting that diagnosis, is "hearsay, self-serving, and inherently unreliable." [Filing No. 121 at 3.]  The Town argues that EAP counseling records submitted by Officer Jaromin merely reflect his subjective statements that he had symptoms of PTSD and that

"[i]t is unclear whether the provider made this diagnosis or simply documented what she was told by [Officer] Jaromin." [Filing No. 121 at 4.]  The Town contends that the evidence, including Officer Jaromin's own testimony, shows that Marshal St. John treated Officer Jaromin like he treated other officers for several years prior to 2020. [Filing No. 121 at 5-6.] The Town maintains that Officer Jaromin did not suffer an adverse employment action, arguing that he did not seek an accommodation related to his PTSD, that he "seemed fine" with being placed on administrative leave, that he only raised issues with being placed on administrative leave at the end of the leave, that it was proper for YPD to consider his PTSD as a potential public safety risk, that various statements by Marshal St. John are taken out of context and do not constitute discrimination, and that Officer Jaromin worked for another entity while on FMLA leave.  [Filing No. 121 at 6-11.]

Both the ADA and the Rehabilitation Act prohibit discrimination against an individual with a disability.  The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a).  "The ADA then defines 'discriminate against a qualified individual on the basis of disability' to include disparate treatment and failure to accommodate: 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee.'" *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (emphasis omitted) (quoting 42 U.S.C. § 12112(b)(5)(A)).  A claim for disparate treatment under the ADA – the claim that Officer Jaromin asserts in this case – requires proof that: "(1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and

(3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020).

The Rehabilitation Act also "'prohibit[s] an employer from discriminating against a qualified individual with a disability because of the disability.'" *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005) (quoting *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999)). To establish a prima facie case for a Rehabilitation Act claim, a plaintiff must prove that he: "(1) falls within the ADA's statutory definition of 'disabled,' meaning that [he] has a physical or mental impairment that substantially limits a major life activity, a record of such impairment, or [is] regarded as having such impairment,…; (2) is otherwise qualified to perform the essential functions of [his] job, with or without reasonable accommodation; and (3) has suffered an adverse employment decision because of the disability." *Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008) (quotations and citations omitted). The Rehabilitation Act and the ADA employ the same standards, so precedent under either statute is instructive. *Id.*; *see also Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012) (relief under the ADA and the Rehabilitation Act "is coextensive" and "the analysis governing each statute is the same," except that the Rehabilitation Act includes an additional element of receipt of federal funds).[3]

---

[3] The Court notes one difference between the Rehabilitation Act and the ADA: "[T]he Rehabilitation Act prohibits discrimination only if it is 'solely by reason of' a person's disability," while "[t]he ADA permits mixed-motive claims." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019). As discussed below, Officer Jaromin has presented enough evidence to overcome the Town's Motion for Summary Judgment on his ADA and Rehabilitation Act discrimination claims based on disparate treatment under the stricter Rehabilitation Act standard, so this difference is not relevant to the Court's analysis.

At the outset, the Court notes that Officer Jaromin does not allege a failure to accommodate claim under either the ADA or the Rehabilitation Act[4] – rather, he alleges that he was discriminated against based on his PTSD when he was placed on administrative leave after disclosing his PTSD and then removed from his role as an investigator and subjected to changes in his shift when he returned from FMLA leave.  A plaintiff asserting a discrimination claim for disparate treatment under the ADA or the Rehabilitation Act may proceed under the approach outlined by the Seventh Circuit Court of Appeals in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016), where the question is "'whether the evidence [considered as a whole] would permit a reasonable factfinder to conclude'" that Officer Jaromin faced an adverse employment action due to his disability.  *Castetter*, 953 F.3d at 996 (quoting *Ortiz*, 834 F.3d at 765).  *Ortiz* dispensed with the old "direct- and indirect-framework" as it relates to the "proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect.'"  834 F.3d at 766.  To show that discrimination was the "but for" cause of an adverse employment action, a plaintiff can point to direct evidence, such as an admission, or to circumstantial evidence, which includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group

---

[4] Officer Jaromin argues in his response to the Motions for Summary Judgment that his "request for help for his PTSD symptoms was a protected request for accommodation." [Filing No. 109 at 51.]  But Officer Jaromin only relies on his request for help during his June 30, 2020 meeting with Marshal St. John and Sgt. Greene in connection with his disparate treatment discrimination claim, arguing that the Town's placement of him on administrative leave was direct discrimination based on his PTSD.  Additionally, the evidence shows that the Town granted his request for help, placing him on paid leave and making efforts to help him find mental health providers.  This evidence is contrary to any notion that the Town failed to accommodate him.  Further, Officer Jaromin does not mention a failure to accommodate his request for help with PTSD in his Statement of Claims, [Filing No. 50], and may not assert such a claim for the first time in his response to the Motions for Summary Judgment.  *See Jackson v. Regions Bank*, 838 F. App'x 195, 198 (7th Cir. 2021) (finding "no abuse of discretion in the district court's enforcement of its requirement that [the plaintiff] specifically state his theories of relief" in his Statement of Claims).

systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trs. of Comm. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

Additionally, the Seventh Circuit has not entirely done away with separate tests or methods to analyze discrimination cases, and it has stated that "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019).  Under the *McDonnell Douglas* framework, a plaintiff must show that "(1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees without a disability were treated more favorably." *Dickerson*, 657 F.3d at 601.  "Once a plaintiff has established a *prima facie* case, the defendant must identify a legitimate non-discriminatory reason for its employment decision.  If the defendant satisfies this requirement, the plaintiff must then prove by a preponderance of the evidence that the defendant's reasons are pretextual." *Id.* (citation omitted).  In order to show pretext, "[a] plaintiff must point to evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the [adverse action] in question, or were insufficient to motivate the termination." *Tibbs v. Admin. Off. of the Ill. Cts.*, 860 F.3d 502, 506 (7th Cir. 2017) (internal quotations and citations omitted). "Merely disagreeing with an employer's reasons does not meet this standard." *Id.*

At the outset, the Court finds that Officer Jaromin cannot prove his claims under the *McDonnell Douglas* framework because he has not even attempted to set forth the last element of a prima facie case of disparate treatment – that the Town treated similarly situated employees

without a disability more favorably.  Officer Jaromin does not address the Town's argument regarding the lack of similarly situated individuals in his response brief and, indeed, acknowledges that Marshal St. John was verbally abusive to numerous other officers and that his behavior resulted in many officers wanting to leave YPD.  The evidence, including testimony from Officer Jaromin, shows that Marshal St. John treated similarly situated officers that did not have PTSD the same way that he treated Officer Jaromin.

The Court goes on to consider whether a reasonable jury could conclude under the direct method that Officer Jaromin was disabled, that he suffered an adverse employment action, and that his disability was the cause of the adverse employment action.

### aa.      Whether Officer Jaromin Was Disabled

Officer Jaromin testified in his deposition that he had been diagnosed with PTSD, but he has not provided medical evidence showing that is the case.  However, the ADA and the Rehabilitation Act also apply when an individual's employer perceives them to be disabled, even if they have not been diagnosed as disabled.  *See* 42 U.S.C. § 12102(1)(C); *Ragan v. Jeffboat, LLC*, 149 F. Supp. 2d 1053, 1062-63 (S.D. Ind. 2001).  When the Town found out that Officer Jaromin had filed a worker's compensation claim in which he stated that he had PTSD, the Town placed him on administrative leave and, eventually, Officer Jaromin took FMLA leave.  At this stage of the litigation, Officer Jaromin has presented sufficient evidence from which a reasonable jury could conclude that the Town regarded him as being disabled as of June 29, 2020, when he filed his worker's compensation claim.  The Court notes, however, that finding that an employee is entitled to FMLA leave does not necessarily mean that the employer considered the employee to be "disabled" for purposes of the ADA.  *See Burnett v. LFW Inc.*, 472 F.3d 471, 483 (7th Cir. 2006) ("[A '[d]isability' under the ADA and [a] 'serious health condition' under the FMLA are

distinct concepts that require different analyses."); *Grady v. FCA US LLC*, 2017 WL 5896894, at
*10 (N.D. Ill. Mar. 30, 2017) (holding that "serious health condition" under the FMLA is not
necessarily a "disability" under the ADA).   While Officer Jaromin has presented enough evidence
to overcome summary judgment on this element of his ADA and Rehabilitation Act claims, Officer
Jaromin will still need to prove this element at trial.

> bb.   *Whether Officer Jaromin Suffered an Adverse
> Employment Action*

An adverse employment action is one that involves "a significant change in employment
status," *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (quotation and citation omitted), and
must be "more disruptive than a mere inconvenience or an alteration of job responsibilities,"
*Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quotation
and citation omitted).   Officer Jaromin claims that he suffered three adverse employment actions
– being placed on administrative leave, not being permitted to work the same schedule he was
working before his leave, and not being permitted to return to his role as an investigator after his
administrative leave.   First, the Court finds that being placed on administrative leave was not an
adverse employment action.   Officer Jaromin remained paid for the entirety of his leave and has
not provided any evidence that he lost benefits or suffered any other consequences while on leave.
*See Nichols*, 510 F.3d at 786 (employee did not suffer adverse employment action when he was
placed on administrative leave and "[did] not claim that his position, salary, or benefits were
impacted by the paid administrative leave").

Second, not being permitted to work the same schedule upon his return from leave, without
evidence that Officer Jaromin was somehow deprived of a benefit because of the schedule change,
was not an adverse employment action.   *See Peters v. Wal-Mart Stores East, LP*, 512 F. Appx 622,
626 (7th Cir. 2013) ("[S]chedule assignments generally are not adverse employment actions.");

*Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 650 (7th Cir. 2011) ("A change in shift assignments will not normally be sufficient to qualify as an adverse employment action, unless it is accompanied by some other detriment.").

However, Officer Jaromin did provide sufficient evidence from which a jury could reasonably conclude that he suffered an adverse employment action in that he was not permitted to hold the position of investigator upon his return from leave, which resulted in at least a $1,000 decrease in his salary. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465-66 (7th Cir. 2002) ("[M]aterially adverse actions may include…a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.").

      cc. *Whether Officer Jaromin's Disability Caused the Adverse Employment Action*

Officer Jaromin must then show that he was removed from his investigator duties due to his disability. He relies on deposition testimony in which Marshal St. John states that he did not return Officer Jaromin to his investigator duties after Officer Jaromin's return from leave because "there is some stress involved in that. And that's probably the most stressful position on the police department. That's my opinion. So he's coming back from PTSD leave or what – however you want to refer to it. I didn't feel like that was right to put him in an investigator role where he would be on call, have to take statements, do extra work. I just wanted to get him back on the road. That's all that was." [Filing No. 64-13 at 96.] This testimony could form the basis for a reasonable jury to conclude that Officer Jaromin was not returned to his investigator duties solely because he suffered from PTSD. Accordingly, the Court **DENIES** the Town's Motion for Summary Judgment as to Officer Jaromin's ADA and Rehabilitation Act discrimination claims related to disparate treatment, but only insofar as the claim is based on the failure to return him to the position of

investigator.  The jury must determine whether such conduct was discriminatory on the basis of disability.

b.   <u>The Equal Protection Clause</u>

In support of its Motion for Summary Judgment, the Town argues that Officer Jaromin cannot bring a disability discrimination claim under the Equal Protection Clause of the Fourteenth Amendment because "[t]he disabled are not a protected class."  [<u>Filing No. 81 at 20</u>.]  It asserts that although the Seventh Circuit of Appeals has not considered the issue since the United State Supreme Court found that states are not required to make special accommodations for the disabled as long as their actions toward disabled individuals are rational, the majority of Circuit Courts that have decided the issue have found that an individual cannot pursue a discrimination claim under the Equal Protection Clause based on a disability.  [<u>Filing No. 81 at 22</u>.]  The Town argues that, in any event, Officer Jaromin's claim fails because he has not identified a Town policy that was the moving force behind his injury or that the Town treated disabled individuals less favorably than those without a disability.  [<u>Filing No. 81 at 22-25</u>.]  The Town notes that Officer Jaromin has not identified what constitutional right was violated and asserts that his argument that the conduct at issue was an official policy of the Town since Marshal St. John was the final policymaker for police matters fails because Marshal St. John did not have final policymaking authority.  [<u>Filing No. 81 at 23-24</u>.]

Marshal St. John sets forth many of the same arguments as the Town in support of his Motion for Summary Judgment, including that Officer Jaromin cannot bring a claim for disability discrimination under the Fourteenth Amendment.  [<u>Filing No. 89 at 2-6</u>.]  He contends that the Equal Protection Clause permits rational discrimination against a disabled individual and that an employee cannot bring a "class of one" claim.  [<u>Filing No. 89 at 4-5</u>.]  Marshal St. John argues that

43

he did not discriminate against Officer Jaromin based on his PTSD and that any differential treatment was supported by a rational basis.  [Filing No. 89 at 6-7.]  He notes that he did not know about Officer Jaromin's PTSD until Officer Jaromin filed his worker's compensation claim in June 2020 and that he did not know that his actions were affecting Officer Jaromin's PTSD until April 2021.  [Filing No. 89 at 7.]  Marshal St. John asserts that all of his conduct after he learned that Officer Jaromin suffered from PTSD was unrelated to the PTSD and supported by a rational basis, including: the decision to put Officer Jaromin on administrative leave; the lack of communication while Officer Jaromin was on leave; contacting potential replacements while Officer Jaromin was on leave; moving Officer Jaromin's personal items out of his desk and telling other detectives that they could each have their own desk; not permitting Officer Jaromin to staff an Ironman event while he was on leave; derogatory statements he supposedly made about Officer Jaromin while he was on leave; directing Officer Jaromin to return to work immediately after he was medically cleared to do so; the decision not to reinstate Officer Jaromin as an investigator; changing Officer Jaromin's work schedule after his leave; not hiring Officer Jaromin for the sergeant position in January 2021; telling the Town Council that he did not want police officers appointed to political positions on the Town Board; the text Marshal St. John sent to the YPD officers regarding Officer Jaromin's wife's comment on a Facebook post; telling Officer Jaromin to pretend that Marshal St. John's girlfriend was not at a crime scene they were investigating (which Marshal St. John claims he did not do); tracking down the owner of a stolen boat and convincing the suspect to return the boat; and investigating the allegations in the letter from Officer Jaromin's attorney and the EEOC Charge.  [Filing No. 89 at 11-19.]  Marshal St. John argues that because there is no clearly established law establishing an equal protection right not to be discriminated against on the basis of disability, he is entitled to qualified immunity.  [Filing No. 89 at 20-22.]

In his response to the Town's and Marshal St. John's Motions for Summary Judgment, Officer Jaromin argues that the Equal Protection Clause prohibits disability discrimination "in an irrational manner or for an illegitimate reason." [Filing No. 109 at 64 (quotation and citation omitted).] He asserts that it was irrational for "Defendants to treat PTSD as a totally disqualifying condition." [Filing No. 109 at 64.] Officer Jaromin asserts that Marshal St. John is not entitled to qualified immunity because the right to be free from disability discrimination in employment is a clearly established right. [Filing No. 109 at 65.] He contends that the Town is responsible for Marshal St. John's Equal Protection violations and that Marshal St. John was the Town's final policymaker because the Town delegated authority to him. [Filing No. 109 at 65.]

In its reply, the Town argues that Officer Jaromin's Equal Protection claim is asserted under a "class of one" theory, and so he must show that he was treated differently from similarly situated co-workers and that there is no rational basis for the difference in treatment. [Filing No. 121 at 14.] The Town argues further that Officer Jaromin does not attempt to show that similarly situated employees were treated differently and that, in any event, YPD had a legitimate interest in ensuring that officers can perform their job safely and in requiring a fitness-for-duty examination before Officer Jaromin was allowed to return to work. [Filing No. 121 at 15-16.] The Town reiterates its argument that Marshal St. John was not the final policymaker. [Filing No. 121 at 16.]

In his reply, Marshal St. John argues that Officer Jaromin did not cite any controlling precedent establishing his equal protection right to be free from disability discrimination so he has not overcome Marshal St. John's claim that he is entitled to qualified immunity. [Filing No. 121 at 4-5.] Marshal St. John further argues that "there is a non-discriminatory reason and/or rational basis for the conduct about which [Officer Jaromin] complains," and notes that Officer Jaromin only addresses two of these such actions – the decision to put him on administrative leave and the

decision not to reinstate him as an investigator upon his return – so has waived any argument regarding other actions. [Filing No. 122 at 6-7.] Marshal St. John argues that Officer Jaromin was not reinstated as an investigator after his leave because Marshal St. John "did not want to put [Officer Jaromin] in the most stressful position in the department upon his return from leave due to a stress-related condition." [Filing No. 122 at 8.]

### i. Whether a Disability Discrimination Claim Under the Equal Protection Clause Exists

The Town and Marshal St. John urge the Court to find that Officer Jaromin cannot bring a disability discrimination claim under the Fourteenth Amendment's Equal Protection Clause, arguing that the Seventh Circuit Court of Appeals has not yet considered whether such a claim exists since the United States Supreme Court's decision in *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001), and that the majority of Circuit Courts that have decided the issue post-*Garrett* have declined to recognize such a claim. [*See* Filing No. 81 at 20-22; Filing No. 89 at 3-6.] The Court discusses this issue below in connection with Marshal St. John's argument that he is entitled to qualified immunity.

### ii. Claim Against Marshal St. John

Marshal St. John argues that even if Officer Jaromin had an equal protection right not to be discriminated against based on his disability, that right was not clearly established at the time the violation occurred so he is entitled to qualified immunity. "A public official is entitled to qualified immunity from suit unless he violated a clearly established constitutional right." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). Dismissal of a claim based on qualified immunity is only appropriate where "the plaintiffs' well-pleaded allegations, taken as true, do not 'state a claim of violation of clearly established law.'" *Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020) (quoting *Behrens v.*

*Pelletier*, 516 U.S. 299, 306 (1996)).  Whether qualified immunity applies involves two questions, which may be addressed in either order: "(1) whether the facts alleged…by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct."  *Dockery*, 911 F.3d at 466 (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "To show that a right is clearly established, the plaintiff must demonstrate that existing caselaw at the time of the events in question 'placed the statutory or constitutional question beyond debate.'"  *Id.* (quoting *al-Kidd*, 563 U.S. at 741); *see also District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) ("'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.") (quotations and citations omitted).

The Court assumes without deciding that Officer Jaromin had an equal protection right to be free from discrimination based on his disability and considers whether that right was clearly established.  In *Garrett*, the Supreme Court found that "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational….  If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection clause."  *Garrett*, 531 U.S. at 367-68.  At least one district court within the Seventh Circuit has interpreted the *Garrett* holding to mean that a plaintiff cannot bring any disability-based claim under the Equal Protection Clause.  *See Arce v. Chicago Transit Auth.*, 193 F. Supp. 3d 875, 893 (N.D. Ill. 2016).  But before the Supreme Court decided *Garrett*, the Seventh Circuit took the opposite approach, finding that "[d]isabled individuals, like any class, are protected by the Equal Protection Clause of the Fourteenth Amendment.  We have previously held that the level of protection afforded to this class is that of rational basis review."  *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 737-38 (7th Cir.

2000).  Since *Garrett*, the Seventh Circuit has not considered the issue and has not reversed its holding in *Stevens*.

In arguing that his Equal Protection right to be free from disability discrimination was clearly established, Officer Jaromin relies on cases from the Fifth and Sixth Circuits, which are not relevant to the analysis.  *See Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000) ("To determine whether a right is clearly established, we look first to controlling Supreme Court precedent and our own circuit decisions on the issue.").  They also do not represent "a consensus of cases of persuasive authority" outside of the Seventh Circuit such that "a reasonable [official] could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).  Officer Jaromin points to the *Stevens* case but, as discussed above, it was decided before the Supreme Court's decision in *Garrett*.  He also relies on three cases from District Courts within this District, where the courts applied rational basis review to disability discrimination claims under the Equal Protection Clause.  Two of those cases relied on *Stevens* in applying rational basis review to disability-based Equal Protection claims, but did not consider the issue of qualified immunity or how *Garrett* might affect the analysis. *Mullins v. Indiana*, 2023 WL 2664176, at *5 (S.D. Ind. Mar. 28, 2023); *Myers v. Sunman-Dearborn Cmny. Schls.*, 2022 WL 911554, at *9 (S.D. Ind. Mar. 29, 2022).  Additionally, both *Mullins* and *Myers* were decided after the events underlying Officer Jaromin's claims.  And while the district court in the last case relied upon by Officer Jaromin – *Schopmeyer v. Plainfield Juvenile Corr. Fac.*, 2002 WL 31255466 (S.D. Ind. Sept. 17, 2022) – relied upon *Garrett* and noted that "[t]here is no legal reason why a class of persons with

48

disabilities is not entitled to assert rights under the Equal Protection Clause" – this single district court case does not clearly establish the right that Officer Jaromin claims was violated. [5]

Because of the uncertainty regarding whether the Seventh Circuit Court of Appeals would continue to recognize a disability discrimination claim under the Equal Protection Clause post-*Garrett*, the Court finds that a Fourteenth Amendment Equal Protection right to be free from disability discrimination was not clearly established when Officer Jaromin alleges he faced discrimination.  Accordingly, Marshal St. John is entitled to qualified immunity on that claim.

In any event, even if Marshal St. John was not entitled to qualified immunity, such a claim is subject to rational basis review and Officer Jaromin would need to show that Marshal St. John: "(1)…intentionally treated him differently from others similarly situated, (2) …intentionally treated him differently because of his [disability], and (3) the difference in treatment was not rationally related to a legitimate state interest." *Smith v. City of Chicago*, 457 F.3d 643, 650-51 (7th Cir. 2006).  As discussed above, Officer Jaromin has not shown that he was treated differently from other officers who were not disabled – in fact, according to Officer Jaromin, Marshal St. John treated many other non-disabled officers poorly.

And to the extent Officer Jaromin's claim is based on being placed on administrative leave or being stripped of his investigator duties upon his return from leave, the Court finds that those actions had "some rational relationship between the disparity of treatment and some legitimate governmental purpose." *Ostrowski v. Lake Cnty.*, 33 F.4th 960, 966 (7th Cir. 2022).  When he met with Marshal St. John to discuss his PTSD, Officer Jaromin expressed concern regarding his stress

---

[5] Both *Garrett* and some of the other cases cited by the parties deal with claims against state defendants, not local units of government as is the case here.  This distinction further supports the Court's conclusion that there was no clearly established constitutional right to be free from disability discrimination.

level and stated that he wanted to get help.  Marshal St. John was rightfully concerned that Officer Jaromin would not be able to effectively do his job, and Officer Jaromin acknowledged those concerns.  The decision to place Officer Jaromin on administrative leave was rationally related to the Town's legitimate interest of keeping the public safe by providing effective police officers.  As for the decision to strip Officer Jaromin of his investigator title when he returned from leave, Marshal St. John explained that the investigator role is one of the most stressful roles within YPD and that he could return to that role eventually, but returning as a patrol officer would give Officer Jaromin time to adjust to being back to work.  The Court finds that this decision was rationally related to the legitimate interest of keeping the public safe.

Because Officer Jaromin is entitled to qualified immunity on Officer Jaromin's discrimination claim based on disparate treatment under the Equal Protection Clause of the Fourteenth Amendment, and since that claim fails under rational basis review in any event, the Court **GRANTS** Marshal St. John's Motion for Summary Judgment as to that claim.

### iii.  Claim Against the Town

Officer Jaromin's disability discrimination claim based on disparate treatment under the Equal Protection Clause against the Town is based on his allegations that Marshal St. John's actions towards Officer Jaromin were taken pursuant to an official policy of the Town because Marshal St. John was the final policymaker for the management of YPD.  [*See* Filing No. 9 at 14.]  A plaintiff may sue a municipality alleging that the defendant's unconstitutional policy, practice, or custom caused a constitutional injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). To prevail on a *Monell* claim, "a plaintiff must ultimately prove three elements: (1) an action pursuant to a municipal policy; (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation,

meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020). There is no respondeat superior liability under § 1983. "Municipal governments cannot be held liable for damages under § 1983 on a theory of respondeat superior for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional municipal policies or customs." *Simpson v. Brown Cnty.*, 860 F.3d 1001, 1005-06 (7th Cir. 2017) (citing *Monell*, 436 U.S. at 690-91). Here, the Town can only be held liable if a Town policy or practice was the moving force behind the constitutional injury.[6]

Officer Jaromin does not provide any evidence that the conduct about which he complains – placing him on administrative leave and stripping him of his investigator role after leave – was taken pursuant to an explicit Town policy.[7] He contends, however, that Marshal St. John was the final policymaker so his decisions amount to a municipal policy, and relies on deposition testimony from Erin Hurley, the Town's Office Manager, who testified that Marshal St. John had the power

---

[6] The Court reads Officer Jaromin's *Monell* claim as being directly based on a constitutional violation and not on a violation of the ADA or the Rehabilitation Act. [*See* Filing No. 9 at 14 (Officer Jaromin alleging in connection with his discrimination claim under the Equal Protection Clause that he "was harmed by Defendants' violation of his rights under the Equal Protection Clause of the 14th Amendment").] The Court notes that "[t]here is no consensus among [the Seventh Circuit or] the other circuits as to whether a plaintiff is barred from bringing Section 1983 claims when the basis for the claim is the violation of parallel rights secured by the ADA or the Rehabilitation Act." *Neal v. Indianapolis Fire Dept.*, 2022 WL 2106143, at *12 n.5 (S.D. Ind. June 10, 2022) (collecting cases). In any event, direct discrimination claims under the ADA or the Rehabilitation Act would take precedence over a *Monell* claim based on a violation of those statutes. *See Archer-Daniels-Midland Co. v. Country Visions Coop.*, 29 F.4th 956, 959 (7th Cir. 2022) (declining to address Fifth Amendment Due Process claim where plaintiff also asserted statutory claim and stating "statutory questions preceded constitutional ones").

[7] Indeed, Officer Jaromin argues that the decision to place him on leave was "contrary to YPD's policy on *Incapacity (Fitness for Duty)*, which only permitted Marshal St. John to order a fit-for-duty exam and only in the event of the failure of the officer to perform his/her assigned duties." [Filing No. 109 at 61 (emphasis and quotation omitted).]

51

to take the following actions without authorization from the Town Board or Town Manager: conducting internal investigations of police officers; placing police officers on administrative leave; setting the schedules for police officers; assigning duties to police officers; and making criminal referrals to the prosecutor's office.  [Filing No. 101-4 at 5-6.]  The Town does not point to any evidence contradicting Ms. Hurley's testimony.

Indiana Code § 36-5-7-4 provides that the Town Marshal "is the chief police officer of the town and has the powers of other law enforcement officers in executing the orders of the legislative body and enforcing laws."  The Seventh Circuit has found that "a police chief in Indiana is the final policymaker for his municipal police department." *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995) (citing Ind. Code § 36-8-3-3(g); Ind. Code §36-8-3.5-11).  But it is not clear that "police chief" and "chief police officer" are one in the same.  *See, e.g.*, *Baldauf v. Davidson*, 2006 WL 3743819, at *22 (S.D. Ind. Dec. 18, 2006) ("[I]t is doubtful that a town marshal could be considered a final policy maker under the powers delegated to him by state law.") (citing Ind. Code § 36-5-7-4).

In any event, because the Court has found that Marshal St. John did not violate Officer Jaromin's equal protection right to be free from disability discrimination under rational basis review, there is no constitutional violation for which the Town can be liable.  The Town's Motion for Summary Judgment is **GRANTED** as to Officer Jaromin's Equal Protection disability discrimination claim.

2.    *Discrimination Based on Hostile Work Environment Claims*

Officer Jaromin sets forth hostile work environment claims under the ADA, the Rehabilitation Act, and the Equal Protection Clause related to "[v]erbal and written comments to [him] and others"; "[i]nvoluntary placement on administrative leave"; "[m]aterial diminution of

52

his privileges and responsibilities"; "[m]aterial changes to his shift schedule"; and "[o]pening a perjury investigation" into his EEOC Charge.  [Filing No. 9 at 16-19.]  The Court addresses Officer Jaromin's claims in turn.

        a.        The <u>ADA and the Rehabilitation Act</u>

### i.      **Claims Against Marshal St. John**

As discussed above, Officer Jaromin cannot assert claims against Marshal St. John under the ADA or the Rehabilitation Act because those statutes only provide for employer liability.  *See Stanek*, 783 F.3d at 644; *AIC Sec. Investigations, Ltd.*, 55 F.3d at 1282.  To the extent Officer Jaromin intends to assert ADA and Rehabilitation Act discrimination claims based on a hostile work environment against Marshal St. John, the Court **GRANTS** Marshal St. John's Motion for Summary Judgment as to those claims.

### ii.      **Claims Against the Town**

In support of its Motion for Summary Judgment, the Town argues that while hostile work environment claims are cognizable under the ADA, Officer Jaromin's claim fails because he was not subjected to harassment based on his disability and any harassment was not so severe as to alter the conditions of employment or create a hostile or abusive working environment.  [Filing No. 81 at 15.]  The Town notes that "the harassment attributable to [Marshal] St. John was the same type of treatment incurred by several YPD [officers]."  [Filing No. 81 at 15.]  It contends that any harassment  that occurred before Marshal St. John knew that Officer Jaromin had PTSD cannot have been based on discriminatory animus and that Marshal St. John learned of Officer Jaromin's PTSD when Officer Jaromin was placed on administrative leave on June 30, 2020.  [Filing No. 81 at 16.]

In his response, Officer Jaromin argues that the Town created a hostile work environment by immediately placing him on leave rather than "ordering a fit-for-duty exam, or even assigning him to administrative duties," by immediately attempting to replace him after placing him on leave, and by making "derisive comments about [his] fitness."  [Filing No. 109 at 62.]

The Town reiterates its arguments in its reply.  [Filing No. 121 at 16-18.]

"[H]ostile work environment claims are cognizable under the ADA." *Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 851 (7th Cir. 2019).  Because the Seventh Circuit Court of Appeals treats claims brought under the ADA and the Rehabilitation Act consistently – with the exception of allowing a "mixed-motive" claim under the ADA, but not under the Rehabilitation Act, *Reed*, 915 F.3d at 484 – the Court assumes that a discrimination claim based on a hostile work environment is also cognizable under the Rehabilitation Act.  *See Altheimer-Umphlett v. DeJoy*, 2023 WL 4365993, at *14 (N.D. Ill. July 6, 2023).  These claims are evaluated the same way that courts evaluate discrimination claims based on a hostile work environment under Title VII, and a plaintiff must provide evidence showing that: "(1) [he] was subject to unwelcome harassment; (2) the harassment was based on disability…; (3) the harassment was sufficiently severe or pervasive, both subjectively and objectively, so as to alter the conditions of [his] employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability." *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022).

Initially, the Court finds that any comments or behavior on the part of Marshal St. John that took place before Marshal St. John learned of Officer Jaromin's PTSD through Officer Jaromin's filing of his worker's compensation claim on June 29, 2020 cannot form the basis of a discrimination claim based on a hostile work environment.  *See id.* (noting that comments co-workers made about plaintiff before learning that plaintiff suffered from PTSD did not support

hostile work environment claim).  As to actions and comments that took place after Marshal St. John learned of Officer Jaromin's PTSD, Officer Jaromin does not attempt to connect specific evidence to his hostile work environment claim, instead arguing generally that immediately placing him on leave rather than "ordering a fit-for-duty exam, or even assigning him to administrative duties," immediately attempting to replace him after placing him on leave, and making "derisive comments about [his] fitness" amounted to a hostile work environment. [Filing No. 109 at 62.]

Officer Jarmon's reliance on the fact that he was placed on administrative leave in the first place and on Marshal St. John's alleged efforts to replace him while he was on leave is misplaced – neither of these circumstances could have created a hostile environment in which Officer Jaromin was forced to work.  Officer Jaromin's leave began immediately and the alleged efforts to replace him occurred while he was on leave.  As to "derisive comments about his fitness," the Court recognizes that Marshal St. John's treatment of Officer Jaromin was often boorish and offensive. But by all accounts, including Officer Jaromin's, Marshal St. John treated many YPD officers the same way – and those other officers did not have PTSD.

Officer Jaromin contends that the following specific comments were made by Marshal St. John regarding Officer Jaromin's PTSD:

- Marshal St. John told others – but not Officer Jaromin – that Officer Jaromin's PTSD was a farce and that Officer Jaromin was a "coward" or "pussy";

- Marshal St. John told others – but not Officer Jaromin – that Officer Jaromin was incapable of being an investigator;

- Marshal St. John told another officer, "[n]ow he's got PTSD," referring to Officer Jaromin, and laughed about it; and

- Marshal St. John told Officer Greene that Officer Jaromin needed to "nut up" about his PTSD because it was all in his head.

[Filing No. 64-11 at 12; Filing No. 64-11 at 47-51.]

But there are several problems with Officer Jaromin's reliance on these comments to support his hostile work environment claim.  First, Officer Jaromin heard these comments secondhand from others – making the comments classic hearsay, which is inadmissible and may not be relied upon to defeat summary judgment.  *See* Fed. R. Evid. 801; Fed. R. Evid. 802; *MMG Fin. Corp. v. Midwest Amusements Parks, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment.").   And even assuming the comments are admissible, they do not establish a hostile work environment because they were not made directly to Officer Jaromin.  *See Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 642 (7th Cir. 2005) ("Because most of the offensive comments giving rise to the plaintiff's claims were made outside of her presence and unbeknownst to her,…we affirm the grant of summary judgment in the defendants' favor on her hostile work environment claim."); *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 272 (7th Cir. 2004) (noting that racially offensive comments did not support hostile work environment claim where they "were not heard directly by plaintiff"); *Walls v. Turano Baking Co.*, 221 F. Supp. 2d 924, 929 (N.D. Ill. 2002) ("Isolated comments made by a supervisor to employees other than plaintiff and outside of the plaintiff's presence, while offensive, are not actionable harassment.").

Further, these comments are not sufficiently severe or pervasive to support a hostile work environment claim.  It is well-established that "[i]nsults, personal animosity, and juvenile behavior are insufficient evidence of a hostile work environment unless they are so pervasive or severe as to interfere with an employee's work performance."  *Brooks*, 39 F.4th at 441.   Additionally, "occasional vulgar language, and coarse, rude, or boorish behavior will not amount to a hostile work environment."  *Id.*  Rather, these comments are "relatively isolated instances of non-severe

misconduct [that do not] support a hostile environment claim." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993).

Other comments Marshal St. John made – including "I have 20 people lined up to replace you," "I reward my friends and punish my enemies," "maybe you are the one that needs to go," "you f***ed up that case," "I'm done talking to you.  I'm afraid of what I might say," "your replacement is a phone call away," "go find another job," and "I burn bridges because I can swim. Don't ever think I need you," among others – have nothing whatsoever to do with Officer Jaromin's PTSD,  and were not based on his disability. Moreover, they were the types of comments that even Officer Jaromin acknowledges Marshal St. John made to others.  These comments constitute the type of "coarse, rude, or boorish behavior" that does not create a hostile work environment. *Brooks*, 39 F.4th at 441.

Because Officer Jaromin has not provided admissible evidence from which a reasonable jury could conclude that he was subjected to a hostile work environment under the ADA or the Rehabilitation Act, the Court **GRANTS** the Town's Motion for Summary Judgment on Officer Jaromin's discrimination claims based on a hostile work environment under the ADA and the Rehabilitation Act.

b.    <u>The Equal Protection Clause</u>

**i.    Claim Against Marshal St. John**

Marshal St. John argues that the comments he made regarding Officer Jaromin do not rise to the level of a hostile work environment because they were made to others and not directly to Officer Jaromin.  [Filing No. 89 at 13-14; Filing No. 89 at 19-20.]

In response, Officer Jaromin argues that "[i]t was irrational…for [Marshal] St. John to mock and deride [Officer] Jaromin for his PTSD."  [Filing No. 109 at 65.]

In his reply, Marshal St. John asserts that he had a rational basis for placing Officer Jaromin on administrative leave and not returning him to the investigator position.  [Filing No. 122 at 6-8.] As for the comments that Officer Jaromin claims Marshal St. John made to others, Marshal St. John argues that they are inadmissible and do not support a hostile work environment claim in any event because they were made to others.  [Filing No. 122 at 8-9.]

As discussed above, Marshal St. John is entitled to qualified immunity on Officer Jaromin's disability discrimination claims based on disparate treatment under the Equal Protection Clause, and even assuming that an Equal Protection claim for disability discrimination based on a hostile work environment exists, the actions supporting that claim would be subject to rational basis review.  *Mullins*, 2023 WL 2664176, at *5.  The Court has already found that Marshal St. John's actions of placing Officer Jaromin on administrative leave due to his PTSD and failing to return him to the investigator position had a rational basis – specifically, to ensure public safety and a smooth return from leave for Officer Jaromin.  As for the derogatory comments upon which Officer Jaromin relies, the Court has already found that they are either inadmissible hearsay or do not rise to the level of a hostile work environment.  While the Court does not condone those comments, they simply are not severe and pervasive enough to support a hostile work environment claim. Moreover, the comments were made to others and not directly to Officer Jaromin. *See Whittaker*, 424 F.3d at 642; *Walls*, 221 F. Supp. 2d at 929.

The Court **GRANTS** Marshal St. John's Motion for Summary Judgment as it relates to Officer Jaromin's claim against him for disability discrimination based on a hostile work environment under the Equal Protection Clause.

### ii.      Claim Against the Town

As with his discrimination claim for disparate treatment under the Equal Protection Clause against the Town, Officer Jaromin brings this claim under *Monell* and alleges that the Town has an official policy because Marshal St. John is its "final policymaker for police management," and that the official policy led to the hostile work environment.  [Filing No. 9 at 17.]  But also as with his discrimination claim for disparate treatment, even assuming that Marshal St. John was the final policymaker, Officer Jaromin's discrimination claim based on a hostile work environment fails because the Court has already found that there is no constitutional violation for which the Town can be liable related to discrimination based on a hostile work environment.  *See Bohanon v. City of Indianapolis*, 46 F.4th 669, 675 (7th Cir. 2022) (plaintiff must show "a direct causal link between the challenged municipal action and the violation of his constitutional rights") (quotation and citation omitted).  Because the Court has found that no reasonable jury could find that Officer Jaromin's constitutional rights were violated, it also finds that Officer Jaromin's discrimination claim based on a hostile work environment under the Equal Protection Clause and *Monell* fails as a matter of law, and **GRANTS** the Town's Motion for Summary Judgment on that claim.

In sum, as to the discrimination claims, the Court: (1) **DENIES IN PART** the Town's Motion for Summary Judgment on Officer Jaromin's ADA and Rehabilitation Act discrimination claims related to disparate treatment based on the failure to return him to the investigator position and **GRANTS** the Town's Motion for Summary Judgment as to any other bases for his disparate treatment claims; (2) **GRANTS** the Town's Motion for Summary Judgment on Officer Jaromin's disability discrimination claim based on disparate treatment under the Equal Protection Clause; (3) **GRANTS** the Town's Motion for Summary Judgment on Officer Jaromin's discrimination claims based on a hostile work environment under the ADA, the Rehabilitation Act, and the Equal

Protection Clause; and (4) **GRANTS** Marshal St. John's Motion for Summary Judgment on Officer Jaromin's disability discrimination claims related to disparate treatment and a hostile work environment under the ADA, the Rehabilitation Act, and the Equal Protection Clause.

### B.    Retaliation Claims

Officer Jaromin alleges retaliation claims against the Town and Marshal St. John under the ADA, the Rehabilitation Act, and the FMLA.  [Filing No. 9 at 19-22.]  The Court notes that the parties' discussions of these claims are not well delineated, often conflating which actions and consequences are relevant to which claims.  Based on the allegations in the Amended Complaint, the Court discerns that Officer Jaromin asserts the following ADA and Rehabilitation Act acts of retaliation: being placed on administrative leave after disclosing his concerns that he had PTSD, being stripped of his investigator duties when he ultimately returned from leave, having his shifts changed when he returned from leave, being denied a promotion to sergeant in 2021, Marshal St. John opening a perjury investigation when he filed his EEOC Charge, being subjected to a hostile work environment, being denied the opportunity to serve on the Town Council, and not being hired for the Town Marshal position after Marshal St. John retired.

The Court reads his FMLA retaliation claim as relating to stripping him of his investigator duties when he ultimately returned from leave, changing his shifts when he returned from leave, being denied a promotion to sergeant in 2021, and failing to promote him to Town Marshal. Accordingly, some of the Court's discussion below is repetitive, but it is important to address each claim under each statute in order to frame the course of this litigation going forward.

1.      *The ADA and Rehabilitation Act*

a.      Claims Against Marshal St. John

As discussed above, Officer Jaromin cannot assert claims against Marshal St. John under the ADA or the Rehabilitation Act because those statutes only provide for employer liability.  *See Stanek*, 783 F.3d at 644; *AIC Sec. Investigations, Ltd.*, 55 F.3d at 1282.  To the extent Officer Jaromin intends to assert ADA and Rehabilitation Act retaliation claims, the Court **GRANTS** Marshal St. John's Motion for Summary Judgment as to those claims.

b.      Claims Against the Town

In support of its Motion for Summary Judgment, the Town argues that it did not know about Marshal St. John's perjury investigation, that once it learned of the investigation it "put a stop to it," and that the investigation did not result in an adverse action to Officer Jaromin.  [Filing No. 81 at 19.]  The Town asserts that Officer Walthour was selected for the Town Marshal position after a "rigorous and fair selection process," and because he was more qualified than Officer Jaromin.  [Filing No. 81 at 19.]

In support of his Motion for Partial Summary Judgment and in response to the Town's Motion for Summary Judgment, Officer Jaromin argues that his April 7, 2021 letter to the Town and his April 23, 2021 EEOC Charge constituted protected activity under the ADA and the Rehabilitation Act.  [Filing No. 109 at 44.]  He contends that Marshal St. John's perjury investigation was an adverse action and that he interrogated several officers in an attempt to disprove Officer Jaromin's allegations and warned each officer that they could face discipline if they were dishonest.  [Filing No. 109 at 45-46.]  Officer Jaromin notes that Marshal St. John recommended that he be disciplined and said that he would refer the matter to the Delaware County Prosecutor for a perjury prosecution, and that "[t]his type of criminal justice response to protected

61

activity is an adverse action." [Filing No. 109 at 47.] He argues that Marshal St. John initiated the perjury investigation because of Officer Jaromin's EEOC Charge, which violated the ADA and the Rehabilitation Act. [Filing No. 109 at 49-50.] Officer Jaromin asserts that Marshal St. John also retaliated against him by putting him on administrative leave after he asked for help on June 29, 2020, which was "a protected request for accommodation." [Filing No. 109 at 51.] Officer Jaromin notes that Marshal St. John also discouraged him from returning after leave, attempted to replace him while he was on leave, joked about his PTSD, and generally created a hostile work environment in retaliation for Officer Jaromin's request for help. [Filing No. 109 at 51-53.] He asserts that he faced further retaliation when he returned from leave and was stripped of his investigator duties (so he did not receive tech pay), was subjected to frequent shift changes, and was subjected to a hostile work environment; Marshal St. John attempted to block him from being appointed to the Town's planning commission; and he was not considered for the Town Marshal position after Marshal St. John resigned. [Filing No. 109 at 50-56.] Officer Jaromin argues that his June 29, 2020 request for help, his April 7, 2021 letter, his EEOC Charge, and this lawsuit all led to retaliation. [Filing No. 109 at 57-62.]

In its response to Officer Jaromin's Motion for Partial Summary Judgment and reply in support of its Motion for Summary Judgment, the Town argues that Officer Jaromin assumed the same position as police officer with the same rank and salary when he returned from leave, and that the decision not to return him to investigator duties was to "help him manage his stress." [Filing No. 121 at 11.] As for shift changes after Officer Jaromin's leave, the Town argues that Officer Jaromin did not express that he was unhappy with his shifts and that this would only constitute an adverse action if it was accompanied by some detriment. [Filing No. 121 at 13-14.] The Town asserts that the Town Council set aside any issues relating to the fact that Officer

Jaromin had initiated this lawsuit when it considered him for the Town Marshal position.  [Filing No. 121 at 20.]  It argues further that Marshal St. John's post-EEOC Charge investigation – which, it claims, is "the adverse retaliatory action for which [Officer Jaromin claims] summary judgment should be entered" – was not an adverse employment action because the Town put a stop to it when it found out and the investigation did not result in referral to the prosecutor.  [Filing No. 121 at 27-28.]

In his reply brief, Officer Jaromin acknowledges that he "seeks summary judgment only as to [Marshal] St. John's clearest violation of the ADA and the Rehabilitation Act – his retaliatory perjury investigation into [Officer] Jaromin's [EEOC Charge]."  [Filing No. 126 at 3.]  Officer Jaromin reiterates his arguments regarding whether the perjury investigation was an adverse employment action.  [Filing No. 126 at 6-8.]

A claim of retaliation under the ADA requires proof that: "(1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action."[8] *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 856 (7th Cir. 2023) (quotation and citation omitted).  A retaliation claim under the Rehabilitation Act requires the same elements of proof.  *See Anderson v. Donahoe*, 699 F.3d 989, 994-95 (7th Cir. 2012).  Under the ADA, a plaintiff must show that "the protected conduct was a substantial or motivating factor in the employer's decision."  *Anderson v. Nations Lending Corp.*, 27 F.4th 1300,

---

[8] A plaintiff can also establish retaliation by presenting "either direct evidence of discrimination or indirect evidence under the burden-shifting analysis prescribed by *McDonnell Douglas*." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005).  But, as with his discrimination claims, Officer Jaromin does not appear to proceed under the *McDonnell Douglas* framework because he does not provide any evidence that similarly situated individuals without a disability were treated more favorably than he was.

1307 (7th Cir. 2022).   The Rehabilitation Act more generally requires "a causal connection" between the statutorily protected activity and the adverse action.  *Id.*

The Town seeks summary judgment related to all of the activity Officer Jaromin claims was protected and resulted in adverse actions, as illustrated in the following table:

| ALLEGED PROTECTED ACTIVITY | ALLEGED ADVERSE ACTION |
|---|---|
| Asking for help with PTSD on June 29, 2020 | • Being placed on administrative leave<br><br>• Being stripped of investigator duties<br><br>• Having his work schedule change<br><br>• Being denied the 2021 sergeant position<br><br>• Being denied the opportunity to be on Town Council |
| April 7, 2021 letter complaining about Marshal St. John | • Marshal St. John's perjury investigation<br><br>• Being subjected to hostile work environment |
| April 23, 2021 EEOC Charge | • Marshal St. John's perjury investigation<br><br>• Being subjected to hostile work environment |
| Filing this lawsuit | • Not being hired for Town Marshal position |

Officer Jaromin seeks summary judgment only on his claim that Marshal St. John's perjury investigation constituted retaliation under the ADA and the Rehabilitation Act for the April 7, 2021 letter and the April 23, 2021 EEOC Charge.

The parties do not appear to dispute that Officer Jaromin asking for help with his PTSD, complaining about Marshal St. John's conduct through the April 7, 2021 letter and the April 23, 2021 EEOC Charge, and filing this lawsuit constituted protected activity under the ADA and the Rehabilitation Act.  While the Court does not necessarily find that they are, the Court will accept

64

the parties' tacit agreement for purpose of resolving the instant motions. The parties do, however, dispute whether the consequences of those activities constituted adverse actions.

As discussed above, an adverse employment action is one which involves "a significant change in employment status," *Boss*, 816 F.3d at 917, and must be "more disruptive than a mere inconvenience or an alteration of job responsibilities," *Nichols*, 510 F.3d at 779. But "[t]he category of actions prohibited by the [ADA's and the Rehabilitation Act's] anti-retaliation provisions is broader than the category of adverse employment actions prohibited by [their] anti-discrimination provisions." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). A materially adverse action for purposes of a retaliation claim is one that would "dissuade[ ] a reasonable worker from engaging in protected activity." *Id.* at 901-02 (quotation and citation omitted). "Materially adverse actions include diminishing financial terms of employment and subjecting an employee to humiliating, degrading, unsafe, unhealthful or otherwise negative alterations in work environment." *Chen v. Yellen*, 2023 WL 2967428, at *3 (7th Cir. April 17, 2023). The Court makes the following findings regarding whether the actions Officer Jaromin relies upon constituted adverse actions and would allow a reasonable jury to conclude that he faced retaliation.

### i.     Being Placed on Administrative Leave

Officer Jaromin reported that he was suffering from PTSD and was immediately placed on administrative leave. He then told Mr. Olson at the end of his administrative leave that he was still suffering from symptoms of PTSD and took FMLA leave. There is no evidence from which a reasonable jury could conclude that placing Officer Jaromin on administrative leave given that he had reported he was suffering from PTSD symptoms (followed by FMLA leave, which he requested based on those same symptoms) would dissuade a reasonable employee from seeking

help with PTSD symptoms or resulted in some sort of negative alteration to his work environment. This action cannot form the basis of a retaliation claim under the ADA or the Rehabilitation Act.

### ii.    Being Stripped of Investigator Duties Upon His Return From Leave

As discussed above, stripping Officer Jaromin of his investigator duties upon his return from leave resulted in him not receiving tech pay. This could be considered an adverse action for purposes of his ADA and Rehabilitation Act retaliation claims because it resulted in a diminution in the financial terms of his employment. The Court further finds – as it has already found in connection with his discrimination claims under the ADA and the Rehabilitation Act – that a reasonable jury could conclude that the decision to strip Officer Jaromin of his investigator duties was made because he had just taken leave due to his alleged disability.

### iii.    Having a Different Work Schedule Upon His Return From Leave

While the Court has found that Officer Jaromin being subjected to a different work schedule upon his return from leave was not an adverse employment action for purposes of his discrimination claims, the Court finds that this could reasonably be considered a negative alteration in Officer Jaromin's work environment and, consequently, the type of adverse action that would support his ADA and Rehabilitation Act retaliation claims.

### iv.    Being Denied the 2021 Sergeant Position

While Officer Jaromin alleges in his Amended Complaint that he faced retaliation when he was denied a promotion to sergeant in 2021, [*see* Filing No. 9 at 20], he does not discuss this in any of his summary judgment briefs. [*See* Filing No. 109; Filing No. 126.] The Town also does not discuss the 2021 sergeant position at all in its briefs. [*See* Filing No. 81; Filing No. 121.] Accordingly, it appears that the Town has not explicitly moved for summary judgment on Officer

Jaromin's ADA and Rehabilitation Act claims related to being denied the 2021 sergeant promotion. Although Officer Jaromin may have an uphill battle ultimately proving that being denied the 2021 sergeant position was due to his disability, the Town has not addressed that claim in its Motion for Summary Judgment so the claim will go forward. *See United States v. Sineneng-Smith*, 140 S.Ct. 1575, 1579 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation, [which is] designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief."); *Mwangangi v. Nielsen*, 48 F.4th 816, 832 (7th Cir. 2022) ("[A] litigant who fails to press a point by supporting it with pertinent authority…forfeits the point.") (quotation and citation omitted).

### v.      Marshal St. John's Perjury Investigation

Generally, investigations into an employee's actions do not constitute an adverse employment action unless they result in some action taken against the employee, such as discipline. *See, e.g.*, *Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016) (in order for action to be adverse, it must produce injury); *Walker v. City of Markham*, --- F. Supp. 3d ----, 2023 WL 3918965, at *6 (N.D. Ill. June 9, 2023) (retaliation claim based on increased surveillance of employee's performance failed because there was no adverse employment action). But, as discussed above, retaliation claims address adverse actions and encompass a broader scope of actions than discrimination claims, which address adverse employment actions. *Freelain*, 888 F.3d at 901. The Court also acknowledges that this case is a little different than the typical internal investigation scenario, which usually involves an employee being investigated for action they took on the job (e.g., a police officer being investigated for his actions during an arrest). Here, the

investigation related directly to whether Officer Jaromin committed wrongdoing, or perjury, when he filed his EEOC Charge.

But Officer Jaromin must still show that the investigation resulted in a change in his employment conditions in order for it to constitute an adverse action. He could do so by showing that it caused him to feel "humiliate[ed] [and] degrad[ed]," which resulted in a "negative alteration in [his] workplace environment." *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). However, while he argues generally that an action can be adverse if it causes the employee to feel humiliated or degraded, [Filing No. 109 at 45], he has not presented any evidence that he, in fact, felt that way due to Marshal St. John's perjury investigation. Officer Jaromin presents evidence that Marshal St. John threatened other officers with consequences if they did not cooperate in the investigation and asked them to conclude that Officer Jaromin had committed perjury at the end of their interviews. But he does not provide evidence that he knew about the investigation when it was taking place or that it changed his conditions of employment. Additionally, the Court finds that Marshal St. John's threat to report Officer Jaromin to the local prosecutor was not an adverse employment action because Marshal St. John never actually did so. *See Lewis v. Wilkie*, 909 F.3d 858, 868 (7th Cir. 2018) (even under broader standard for retaliation claim, an "unfulfilled threat of discipline" or a "threat of future discipline" that did not result in an "injury or harm greater than stress or worry" is not an adverse action).

However, the Court finds that Officer Jaromin has presented enough evidence from which a reasonable jury could conclude that Marshal St. John's perjury investigation would dissuade a reasonable employee from engaging in protected activity. It further finds that, at the same time, he has not presented sufficient evidence which would foreclose a reasonable jury from concluding the opposite. Accordingly, the Court finds that whether Marshal St. John's perjury investigation

constituted an adverse action is a fact issue that must be determined by a jury.  The Court **DENIES** the Town's Motion for Summary Judgment and **DENIES** Officer Jaromin's Motion for Partial Summary Judgment on Officer Jaromin's ADA and Rehabilitation Act claims based on Marshal St. John's perjury investigation.

### vi.    Being Subjected to a Hostile Work Environment

As the Court has already found, Officer Jaromin has not presented sufficient evidence from which a reasonable jury could conclude that he was subjected to a hostile work environment. Accordingly, any retaliation claim based on being subjected to a hostile work environment fails as a matter of law.

### vii.    Being Denied the Opportunity to be on the Town Council

While Officer Jaromin alleges that Marshal St. John told Town Council members that he did not want Officer Jaromin to serve on the Town Council, the parties do not discuss this allegation in connection with Officer Jaromin's retaliation claims.  In any event, Officer Jaromin would need to show that being denied the opportunity to be on the Town Council resulted in some sort of negative alteration to his work environment.  *Chen*, 2023 WL 2967428, at *3.  Being on the Town Council was not part of Officer Jaromin's job, so any action Marshal St. John took to exclude Officer Jaromin from serving on the Town Council, while perhaps vindictive and unfair, did not constitute an adverse action and cannot form the basis of a retaliation claim under the ADA or the Rehabilitation Act.

### viii.    Not being hired for the Town Marshal position

The Town's failure to hire Officer Jaromin for the Town Marshal position could reasonably be considered an adverse action.  *See Poullard*, 829 F.3d at 858 ("The denial of a promotion can

be an adverse action for purposes of a retaliation claim.").  Additionally, Officer Jaromin has presented sufficient evidence from which a reasonable jury could conclude that Officer Jaromin was passed over for the Town Marshal position due to filing his EEOC Charge and/or this lawsuit. For example, he presents evidence that a Board Member called him and told him that she had emailed the Town Board and asked them to consider this lawsuit in the decision-making process and expressing doubts that he could serve as Town Marshal.  [Filing No. 64-11 at 68.]  He also presents evidence that former Town Marshal Ginnan was told by several Board Members that Officer Jaromin would never be hired as the Town Marshal because "he sued the Town."  [Filing No. 64-11 at 68-69.]  The Town completely ignores this evidence in its reply brief, instead relying on evidence from other Town Council members that the Town Council did not consider the EEOC Charge or this lawsuit in making its decision.  At the very least, there is a genuine issue of fact regarding whether Officer Jaromin was passed over for the Town Marshal position because he filed his EEOC Charge and this lawsuit.

In sum, the Court: (1) **GRANTS** the Town's Motion for Summary Judgment on Officer Jaromin's ADA and Rehabilitation Act retaliation claims against the Town related to being placed on administrative leave,  not being able to serve on the Town Council, and being subjected to a hostile work environment; (2) **DENIES** the Town's Motion for Summary Judgment on Officer Jaromin's ADA and Rehabilitation Act retaliation claims against the Town related to Officer Jaromin being stripped of his investigator duties upon his return from leave, being subjected to shift changes upon his return from leave, Marshal St. John's perjury investigation, and not being hired for the Town Marshal position; and (3) **DENIES** Officer Jaromin's Motion for Partial Summary Judgment.

2.      *The FMLA*

Officer Jaromin's FMLA retaliation claims are based on stripping him of his investigator duties and changing his shift after returning from leave, failing to promote him to sergeant in 2021, and failing to promote him to Town Marshal.  [*See* Filing No. 9 at 22; Filing No. 50 at 3.]  The Town and Officer Jaromin set forth the same arguments they asserted in connection with the ADA and Rehabilitation Act retaliation claims.  Marshal St. John – who does not contend that he is not subject to the FMLA – argues that he had valid reasons for not reinstating Officer Jaromin as investigator after his leave and that the shift changes were not related to his leave.  [Filing No. 89 at 16-17; Filing No. 89 at 24; Filing No. 122 at 13-15.]

The FMLA permits eligible employees suffering from serious medical conditions to take unpaid leave from their jobs, 29 U.S.C. § 2612(a)(1)(D), and prevents employers from retaliating against the employee's use of such leave, 29 U.S.C. § 2615(a)(2).  *See Pagel v. TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012).  Stating a claim of retaliation under the FMLA requires the plaintiff to allege facts showing that either: (1) "his employer took [a] materially adverse action against him on account of his protected activity," such as using FMLA leave, or (2) "after taking FMLA leave…he was treated less favorably than other similarly situated employees who did not take FMLA leave, even though he was performing his job in a satisfactory manner." *Burnett v. LFW Inc.*, 472 F.3d 471, 481-82 (7th Cir. 2006) (quotation and citation omitted).  The protected conduct must be "a substantial or motivating factor in the employer's decision." *Anderson*, 27 F.4th at 1307. An individual may be held liable under the FMLA if: "(1) the individual had supervisory authority over the plaintiff; and (2) the individual was at least partly responsible for the alleged violation." *Cuff v. Trans States Holdings, Inc.*, 816 F. Supp. 2d 556, 566 (N.D. Ill. 2011).

The Court has already found that stripping Officer Jaromin of his investigator duties could be considered an adverse action.  Distinct from his ADA and Rehabilitation Act retaliation claims, which focus on retaliation for having a disability, Officer Jaromin's FMLA retaliation claim focuses on being stripped of his investigator duties because he took leave.  The proper claim related to stripping Officer Jaromin of his investigator duties upon his return from FMLA leave, however, is an FMLA interference claim.  *See Barton v. Zimmer, Inc.*, 662 F.3d 448, 457 (7th Cir. 2011) (FMLA interference claim is based on FMLA's requirement that employee be "restored by the employer to the position of employment held by the employee when the leave commenced").  As discussed below, Officer Jaromin has set forth sufficient evidence to overcome summary judgment in connection with his FMLA interference claim, and that claim will proceed.  The Court **GRANTS** the Town's and Marshal St. John's Motions for Summary Judgment on Officer Jaromin's FMLA retaliation claim as it relates to stripping him of his investigator duties upon his return from FMLA leave – that alleged wrong is addressed in his FMLA interference claim.

The Court has also found that subjecting Officer Jaromin to shift changes upon his return from leave could reasonably be considered an adverse action, and it further finds that Officer Jaromin has presented sufficient evidence from which a reasonable jury could conclude that this adverse action was due to him taking FMLA leave.

The Court also finds that not hiring Officer Jaromin for the Town Marshal position could reasonably be considered an adverse action, but Officer Jaromin has not presented sufficient evidence from which a reasonable jury could find that the Town Council's decision not to consider or hire Officer Jaromin was based on the fact that he took FMLA leave.  The only proffered evidence to support a claim for refusal to consider or hire Officer Jaromin for the Town Marshal position relates instead to retaliation for complaining about discrimination – not retaliation for

taking FMLA leave.  The Court also notes that it appears that neither the Town nor Officer Jaromin have explicitly moved for summary judgment on Officer Jaromin's FMLA retaliation claims related to being denied the 2021 sergeant promotion, so that claim will proceed.

The Court **GRANTS** the Town's and Marshal St. John's Motions for Summary Judgment on Officer Jaromin's FMLA retaliation claims to the extent they are based on stripping Officer Jaromin of his investigator duties upon his return from leave and failing to hire Officer Jaromin for the Town Marshal position.  The Court **DENIES** the Town's and Marshal St. John's Motions for Summary Judgment on Officer Jaromin's FMLA retaliation claims to the extent they are based on Officer Jaromin being subjected to shift changes upon his return from leave.   The Court notes again that the motions did not address the 2021 failure to promote Officer Jaromin to sergeant claim, and that claim will proceed.

### C.    FMLA Interference Claim

Officer Jaromin alleges that Defendants interfered with his FMLA leave by changing his shifts and stripping him of his investigator duties when he returned from leave.  [Filing No. 9 at 21.]

In support of its Motion for Summary Judgment, the Town argues that Officer Jaromin was not entitled to take FMLA leave in the first place because he claims he was fit for duty when he took leave and he worked as  police officer for a hospital during his FMLA leave.  [Filing No. 81 at 25-26.]  The Town also argues that Officer Jaromin took the full twelve weeks of FMLA leave to which he was entitled.  [Filing No. 81 at 27.]

Marshal St. John argues in support of his Motion for Summary Judgment that he was not involved in determining whether Officer Jaromin could take FMLA leave and did not interfere in that leave.  [Filing No. 89 at 22-23.]

Officer Jaromin responds that Defendants interfered with his FMLA leave by stripping him of his investigator duties and changing his shifts upon his return from leave. [Filing No. 109 at 68-70.]

In its reply, the Town argues that Marshal St. John stripped Officer Jaromin of his investigator duties to help him adjust to being back at work and that other officers were subject to shift changes and the changes did not adversely affect Officer Jaromin's employment. [Filing No. 121 at 12-14.]

Marshal St. John argues in his reply that not returning Officer Jaromin to his investigator duties did not interfere with his FMLA leave because he was only entitled to return to the same position had he not taken FMLA leave, he was on administrative leave immediately before taking FMLA leave, and YPD was justified in "eas[ing] him back with patrol duties only to limit his stress upon his reentry into active police work." [Filing No. 122 at 11.]

To prove an FMLA interference claim, Officer Jaromin must establish that: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to take leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied [or interfered with]…FMLA benefits to which he was entitled." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816 (7th Cir. 2015) (quotation and citation omitted). An employer can interfere with FMLA leave by not returning the employee to the same position he held before leave. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 636 (7th Cir. 2009).

The Court finds that Officer Jaromin has provided sufficient evidence from which a reasonable jury could conclude that Defendants interfered with his FMLA leave by failing to return him to his role as an investigator after he returned from leave. The Court also finds, however, that

subjecting Officer Jaromin to different shifts when he returned from leave, without evidence of some detriment, does not constitute the type of consequence an FMLA retaliation claim addresses. Accordingly, the Court **DENIES** the Town's and Marshal St. John's Motions for Summary Judgment on Officer Jaromin's FMLA interference claim to the extent it is based on a failure to return Officer Jaromin to his investigator duties after leave.[9]

### D.  State Law Claims[10]

Officer Jaromin asserts state law claims for defamation, abuse of process, and intentional infliction of emotional distress.  [Filing No. 9 at 23-24.]

#### 1.  Claims Against the Town

The Town argues that it does not appear that Officer Jaromin asserts his state law claims against the Town and that, even if he did, those claims would fail because Officer Jaromin did not comply with the notice requirement of the Indiana Tort Claims Act ("ITCA").  [Filing No. 81 at 29.]

In his response, Officer Jaromin argues that he alleged at the beginning of his Amended Complaint that he was suing the Town and Marshal St. John for defamation, abuse of process, and intentional infliction of emotional distress and that "actions against individual defendants in their official capacities are treated as suits brought against the government entity itself."  [Filing No.

---

[9] The Court notes that an employer may escape liability for FMLA interference if it can show that it had an "honest suspicion" that the employee was not using FMLA leave for its intended purpose. *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 681-82 (7th Cir. 1997).  Evidence relating to other jobs that Officer Jaromin held during his FMLA leave may become relevant to his FMLA interference claim.

[10] Because some of Officer Jaromin's federal claims are going forward, the Court exercises supplemental jurisdiction over Officer Jaromin's state law claims since those claims are so related to the remaining federal claims that they "form part of the same case or controversy." 28 U.S.C. § 1367(a).

109 at 75-76.]  He contends that he complied with the notice requirements of the ITCA through his counsel's April 7, 2021 letter, his EEOC Charges, a May 19, 2021 email from his counsel to the Town.  [Filing No. 109 at 75.]

The Town argues in its reply that state law claims brought against individual state actors are not also considered as made against the governmental entity.  [Filing No. 121 at 21.]  It asserts that Officer Jaromin did not comply with the ITCA's notice requirements because there is no evidence that Officer Jaromin sent the letter, email, or EEOC Charges to the "Indiana political subdivision risk management commission" or that they were sent by certified or registered mail as required by the ITCA.  [Filing No. 121 at 21.]  Additionally, the Town notes that none of those documents referenced state law claims – they only mentioned discrimination and retaliation claims under federal law.  [Filing No. 121 at 21-22.]

"The ITCA provides…that a claim against a political subdivision is barred unless notice is filed with 'the governing body of that subdivision…within one hundred eighty (180) days after the loss occurs.'"  *Chariton v. City of Hammond*, 146 N.E.3d 927, 931 (Ind. Ct. App. 2020) (quoting Ind. Code § 34-13-3-8).  "Compliance with the notice provisions of [the] ITCA is a procedural precedent which the plaintiff must prove and the trial court must determine prior to trial."  *Id.* (quotation and citation omitted).  While substantial compliance with the notice requirements may suffice when "the purpose of the notice requirement is satisfied," this is a fact-specific determination and when a plaintiff fails within the 180 days "to file any notice of an intent to make a claim, actual knowledge of the occurrence on the part of the [governmental entity], even when coupled with an investigation of the occurrence, will not suffice to prove substantial compliance."  *Murphy v. Ind. State Univ.*, 153 N.E.3d 311, 318 (Ind. Ct. App. 2020).

Even assuming that Officer Jaromin intended to assert his state law claims against the Town in the first place, the Court finds that he did not comply with the ITCA's notice requirement. Officer Jaromin has not put forth any evidence that he provided the April 7, 2021 letter, the EEOC Charges, or his counsel's May 19, 2021 email to the Town's governing body. Nor do any of those documents mention state law tort claims like the ones Officer Jaromin asserts in this case. The Court **GRANTS** the Town's Motion for Summary Judgment on Officer Jaromin's state law claims to the extent those claims are asserted against the Town in the first place.[11]

2.      *Claims Against Marshal St. John*

In support of his Motion for Summary Judgment, Marshal St. John argues that all of the conduct upon which Officer Jaromin's state law claims are based occurred within the scope of Marshal St. John's employment and so he is entitled to qualified immunity on those claims. [Filing No. 89 at 25.] He notes that an Indiana statute contemplates a police chief bringing disciplinary charges against an officer, that his perjury investigation related to "a matter of officer conduct and potential discipline," and that "[i]t does not matter whether the town explicitly authorized the investigation or instructed [him] to cease." [Filing No. 89 at 26.] Marshal St. John argues further that the remaining conduct upon which Officer Jaromin's intentional infliction of emotional distress claim is based – comments he made to Officer Jaromin over the course of his employment, placing Officer Jaromin on administrative leave, stripping Officer Jaromin of his investigator

---

[11] In order to preserve a claim, the party seeking relief must include that claim in their Statement of Claims, or the claim may be deemed abandoned. *See Jackson*, 838 F. App'x at 198. Officer Jaromin does not mention the Town at all when describing his defamation, abuse of process, and intentional infliction of emotional distress claims in his Statement of Claims. [Filing No. 50 at 3-4.] This failure to clearly articulate his state law claims against the Town provides another basis upon which the Court grants the Town's Motion for Summary Judgment on those claims.

duties, changing Officer Jaromin's shift schedule, and discouraging Officer Jaromin from taking leave – were clearly within the scope of his employment.  [Filing No. 89 at 29.]

In his response, Officer Jaromin argues that "[Marshal] St. John's abuse of his power to punish [Officer] Jaromin – including especially the perjury investigation he undertook for his personal benefit – take him outside the law's protection."  [Filing No. 109 at 75.]

Marshal St. John reiterates his arguments in his reply.  [Filing No. 122 at 16-18.]

The ITCA governs state law tort claims against governmental entities and public employees. *Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003).  "Among other things the statute provides substantial immunity for conduct within the scope of the employee's employment." *Id.*  Specifically, "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally." Ind. Code § 34-13-3-5(b); *see also Ball v. City of Indianapolis*, 760 F.3d 636, 645 (7th Cir. 2014) ("Under the [ITCA], there is no remedy against the individual employee so long as he was acting within the scope of his employment.").

Conduct is within the scope of an employee's employment if it is "of the same general nature as that authorized, or incidental to the conduct authorized," by the employer. *Bushong*, 790 N.E.2d at 473 (internal quotations and citations omitted).  "An act is incidental to authorized conduct when it is subordinate to or pertinent to an act which the servant is employed to perform, or when it is done to an appreciable extent, to further his employer's business." *Id.* (internal quotations and citations omitted).  "Even criminal acts may be considered as being with the scope of employment if the criminal acts originated in activities so closely associated with the employment relationship as to fall within its scope." *Id.* (quotation and citation omitted).  Whether an employee was acting within the scope of his employment is ordinarily a question of fact, but

78

"under certain circumstances the question may be determined as a matter of law." *Id.* at 473-74 (affirming trial court's conclusion at summary judgment that defendant was acting within the scope of his employment, given that the facts were not disputed).

Officer Jaromin does not specifically argue that comments Marshal St. John made to him over the course of his employment, placing Officer Jaromin on administrative leave, stripping Officer Jaromin of his investigator duties, changing Officer Jaromin's shift schedule, or allegedly discouraging Officer Jaromin from taking leave were outside the scope of Marshal St. John's employment, so has forfeited any argument that this was the case. *See Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument…results in waiver," and "silence leaves us to conclude" that the silent party is making a concession).  In any event, the Court finds that those actions were clearly within the scope of Marshal St. John's employment.

As to Marshal St. John's perjury investigation, Officer Jaromin argues conclusorily that the investigation was outside the scope of Marshal St. John's employment because it was "malicious, willful and wanton, or calculated to benefit him personally," and was an "abuse of his power to punish [Officer] Jaromin." [Filing No. 109 at 74-75.] But Marshal St. John was the Town Marshal, tasked with managing YPD and disciplining officers.  His investigation into Officer Jaromin's allegations, as set forth in his counsel's letter and his EEOC Charges, was within the scope of his employment as Town Marshal.  *Cf. Waldrip v. Waldrip,* 976 N.E.2d 102, 115 (Ind. Ct. App. 2012) (in a case relied upon by Officer Jaromin, court found that court reporter employed by the Monroe County Circuit Court was not entitled to ITCA immunity for making false criminal accusations against her then-husband in order to gain advantage in custody proceedings).  A lack of specific authority from the Town Council to carry out the perjury investigation does not change the Court's conclusion that it was within the scope of Marshal St. John's employment.  *See Bushong,* 790

N.E.2d at 473 (even wrongful conduct can be considered within the scope of employment). Accordingly, Marshal St. John is entitled to qualified immunity on Officer Jaromin's state law claims and the Court **GRANTS** Marshal St. John's Motion for Summary Judgment on those claims.[12]

**IV.**
**CONCLUSION**

By many accounts, Marshal St. John was not an easy to man to work for.  His harsh management style seemed to make for an unpleasant work environment for many YPD officers, causing several of them to seek employment elsewhere.  But while Officer Jaromin has provided sufficient evidence to overcome summary judgment on some of his claims, many of his claims fail as a matter of law because the undisputed evidence that he does provide does not rise to the level of conduct that is actionable.

---

[12] Given the Court's finding that all of the actions upon which Officer Jaromin bases his state law claims against Marshal St. John were within the scope of Marshal St. John's employment, the Court also finds that Marshal St. John is entitled to summary judgment on those claims because Officer Jaromin did not provide the notice required by the ITCA. "The [ITCA's] notice requirement applies not only to political subdivisions but also to employees of political subdivisions as well," *Moon v. Nash*, 2023 WL 3223797, at *2 (N.D. Ind. May 3, 2023), so long as "the act or omission causing the plaintiff's loss is within the scope of defendant's employment," *VanValkenburg v. Warner*, 602 N.E.2d 1046, 1049 (Ind. Ct. App. 1992).  *See also Sowell v. Dominguez*, 2011 WL 294758, at *12 (N.D. Ind. Jan. 26, 2011) ("A plaintiff cannot avoid the notice requirements [of the ITCA] simply by suing a governmental employee in his or her individual capacity.")  Even though Marshal St. John does not raise the ITCA notice requirement argument in his Motion for Summary Judgment, Officer Jaromin had an adequate opportunity to respond to the Town's argument regarding a lack of notice so the Court can impute the argument by the Town to Marshal St. John to the extent the argument is effective at barring the claims against Marshal St. John – and it is.  *See Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 1986) (holding that where one defendant filed a motion that was equally effective in barring the claims against the other defendants, the Court could *sua sponte* enter judgment in favor of the non-moving defendant if the plaintiff had an adequate opportunity to argue in opposition to the motion).  The Court notes that Marshal St. John raised the failure to provide notice under the ITCA as an affirmative defense in his Answer, [Filing No. 17 at 19], as he must in order for a lack of notice to bar the state law claims against him.  *See Davidson v. Perron*, 716 N.E.2d 29, 33-34 (Ind. Ct. App. 1999).

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** the Town's and Marshal St. John's Motions for Summary Judgment, [62; 63], as set forth above, and **DENIES** Officer Jaromin's Motion for Partial Summary Judgment, [98]. The following claims remain for trial:

- Discrimination based on disparate treatment under the ADA and the Rehabilitation Act against the Town related to Officer Jaromin being stripped of his investigator duties upon his return from leave and not receiving the 2021 sergeant promotion;

- Retaliation under the ADA and the Rehabilitation Act against the Town related to Officer Jaromin being stripped of his investigator duties upon his return from leave, being subjected to shift changes upon his return from leave, Marshal St. John's perjury investigation, not receiving the 2021 sergeant promotion, and not being hired for the Town Marshal position;

- Retaliation under the FMLA against the Town and Marshal St. John related to Officer Jaromin being subjected to shift changes upon his return from leave and not receiving the 2021 sergeant promotion; and

- FMLA interference against the Town and Marshal St. John related to the failure to return Officer Jaromin to his investigator duties upon his return from leave.

The Court requests that the Magistrate Judge confer with the parties as soon as practicable regarding a possible resolution of the remaining claims short of trial.

Date: 10/11/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

81